**TO–AM EQUIPMENT CO., INC.,**
Plaintiff–Appellee,

v.

**MITSUBISHI CATERPILLAR FORKLIFT AMERICA, INC.,**
Defendant–Appellant.

No. 97–1395.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 31, 1997.

Decided Aug. 6, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 31, 1998.*

* Hon. Frank H. Easterbrook did not participate in the consideration of the petition.

Gary W. Leydig (argued), Robin L. Hoberman, Levin McParland, Phillips, Leydig & Haberkorn, Chicago, IL, for plaintiff–appellee.

Stacy Lee Prange, McBride, Baker & Coles, Chicago, IL, David E. Zajicek, McBride, Baker & Coles, Oakbrook Terrace, IL, Kenneth G. Cole, Thomas J. Collin (argued), Kristin M. Ehlers, Thompson, Hine & Flory, Cleveland, OH, for defendant–appellant.

Before POSNER, Chief Judge, and ROVNER and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

Legal terms often have specialized meanings that can surprise even a sophisticated party. The term "franchise," or its deriva-

tive "franchisee," is one of those words. The question in this case is whether the district court correctly ruled that certain payments that To–Am Equipment Company made to Mitsubishi Caterpillar Forklift America (MCFA), in connection with To–Am's distributorship for certain Mitsubishi products, could constitute franchise fees within the meaning of the Illinois Franchise Disclosure Act of 1987, 815 ILCS 705/1 et seq. That ruling in turn set the stage for a jury verdict in To–Am's favor awarding it $1.525 million in damages for MCFA's termination of its distribution agreement. MCFA challenges the lower court's legal ruling on appeal, and argues in addition that the district court erred in refusing to grant a new trial or in the alternative a remittitur of the damages. We affirm.

## I

The Mitsubishi keiretsu (the traditional Japanese form of conglomerate) is a well known manufacturer of heavy equipment, including forklift trucks. In June 1985, To–Am entered into a dealership agreement for these forklifts with a company affiliated with Mitsubishi, Machinery Distribution, Inc. (MDI). (In 1992 MDI became part of a new entity, MCFA, which assumed its role in the contract and which we, like the parties, will refer to exclusively henceforth.) To–Am had been doing business in south Chicago since 1973, servicing, renting, and repairing forklifts. Over the years it also sold a number of different brands of forklifts, including those made by Clark, Yale, and Hyster, though prior to its contract with MCFA it sold only used forklifts. Before allowing To–Am to become a Mitsubishi dealer MCFA required To–Am to relocate to a larger showroom. To–Am complied and moved to Frankfort, Illinois. During the years it served as a Mitsubishi dealer To–Am continued to handle used forklifts manufactured by Mitsubishi's competitors—in other words, the dealership did not require exclusivity on To–Am's part. On the other hand, the agreement conferred on To–Am an exclusive Area of Primary Responsibility (APR), consisting of four Illinois counties and one county in Indiana, in which MCFA did not have and agreed not to create a competing dealership.

Under the 1985 contract (the only one ever entered between the parties), To–Am was required to participate in Mitsubishi's warranty program. This meant, among other things, that To–Am had to maintain trained personnel and provide prompt warranty and non-warranty service on all Mitsubishi products within its APR. To comply with these requirements, To–Am participated in all of MCFA's training programs, apparently for the most part at its own expense. Article III para. 14 of the agreement expressly required To–Am to "maintain an adequate supply of current [MCFA] sales and service publications." To–Am did so by keeping a master set of manuals in its parts department, a second set in its service department, and additional manuals in its mobile service vehicles (a necessity in this business). MCFA provided one set of these manuals in 1985 when To–Am became a distributor, but thereafter To–Am had to order additional manuals for the other locations where it kept manuals, for updating, and when manuals wore out. MCFA invoiced To–Am for these additional manuals, and over the years To–Am paid over $1,600 for them. At trial MCFA argued that it updated To–Am's manuals with all new releases free of charge, and that it viewed one full set (which it claimed to have supplied to To–Am) as an "adequate supply." Other evidence, however, indicated that MCFA dealers, including To-Am, did not receive free updates and that one set was not "adequate" for a dealer of To–Am's size. Taking the evidence in the light most favorable to To–Am, as of course we must, e.g., *Riemer v. Illinois Dept. of Transportation*, 148 F.3d 800, 805–06 (7th Cir.1998), we conclude that to satisfy this clause of the dealership contract To–Am had to purchase these additional manuals. (We address later whether such payments were indirect franchise fees.)

In February 1994, MCFA notified To–Am that it was terminating the dealership agreement effective April 2, 1994, in accordance with Article XI para. 1 of the agreement, which permitted either party to terminate upon 60 days' written notice "or as required by law." This step was a blow to To–Am's business, even though after MCFA's action

To–Am continued to service, repair, lease, and rent Mitsubishi forklift trucks, and continued to service and repair other brands of forklift trucks. The reason was simple: Mitsubishi forklifts were the only new vehicles that To–Am had been selling. Even though new truck sales are themselves relatively low profit generators for dealers, they can create substantial downstream business, ranging from trade-ins that could be resold as used equipment or carried as rental equipment, to service and parts sales. Testimony at trial indicated that, while dealer profit margins on new equipment sales might be as low as 3%, the margins on these downstream business opportunities ranged from 30% to 50%. Cf. *Chrysler Corp. v. Kolosso Auto Sales, Inc.*, 148 F.3d 892, 893–94 (7th Cir.1998) (financial interests of manufacturers and dealers may diverge). Thus, the loss of To–Am's line of new trucks had ripple effects on its business going far beyond the immediate lost sales.

To–Am therefore brought this suit against MCFA, its predecessor, and a variety of affiliated individuals and corporations on January 5, 1995, in the Circuit Court of Will County, Illinois. To–Am alleged violations of the Illinois Franchise Disclosure Act by all defendants for the wrongful termination of its franchise without good cause, and breach of contract by MCFA for its failure to repurchase To–Am's inventory following termination. On February 9, 1995, the defendants removed the case to the United States District Court for the Northern District of Illinois, and MCFA filed a counterclaim for $78,000 in unpaid invoices. Eventually it won summary judgment on the counterclaim, which To–Am paid, so there is nothing about it that need concern us. Likewise, To–Am's contract claim and all defendants other than MCFA have by now dropped out of the case.

Before trial, MCFA moved for summary judgment on the question whether To–Am had paid any "franchise fees" within the meaning of the Illinois Act, which the district court granted in part and denied in part. It rejected To–Am's contention that several types of payments to MCFA were in fact indirect franchise fees, including To–Am's argument that payments to MCFA for To–Am employees attending MCFA service schools amounted to franchise fees. On the other hand, the court concluded that To–Am's payments for service and parts manuals were required and therefore could satisfy the statutory definition of a franchise fee. 815 ILCS 705/3(14). Prior to trial MCFA conceded that To–Am met the requirement under the Franchise Disclosure Act that the franchisee's business be substantially associated with the franchisor's trademark. 815 ILCS 705/3(1)(b). MCFA also conceded that the termination was without good cause, as the Act uses the term. See 815 ILCS 705/19. The case thus went to trial on the two remaining criteria for whether To–Am was a franchisee: (1) did To–Am pay MCFA an indirect franchise fee of $500 or more, 815 ILCS 705/3(1)(c); and (2) did the distributorship agreement give To–Am the right to conduct its business under a marketing plan prescribed or suggested in substantial part by MCFA. 815 ILCS 705/3(1)(a). The jury found for To–Am on both questions, and as we noted it returned a generous verdict for To–Am. After the district court denied MCFA's post-trial motions under Rules 50(b) and 59 and (as provided by statute) awarded To–Am its attorneys' fees and costs, MCFA timely appealed.

## II

MCFA has made it clear that it is appealing only two points: whether To–Am paid it a sufficient "franchise fee" as defined by the Franchise Disclosure Act to be considered a franchisee, and the appropriateness of the jury's damage award. We can therefore confine our own discussion to these issues.

### A. Franchise Fees

The Franchise Disclosure Act defines a franchise fee as follows:

> [A]ny fee or charge that a franchisee is required to pay directly or indirectly for the right to enter into a business or sell, resell, or distribute goods, services or franchises under an agreement, including, but not limited to, any such payments for goods or services, provided that the Administrator may by rule define what constitutes an indirect franchise fee, and provided further that the following shall not

be considered the payment of a franchise fee [setting forth six exceptions, none of which MCFA argues apply here].

815 ILCS 705/3(14). As this section specifically contemplates, the Illinois Attorney General, as the Administrator of the statute, see 815 ILCS 705/3(19), has issued a number of pertinent implementing regulations. First, he has elaborated on the definition of the term "franchise fee":

A franchise fee within the meaning of Section 3(14) of the Act may be present regardless of the designation given to or the form of the fee, whether payable in lump sum or installments, definite or indefinite in amount, or partly or wholly contingent on future sales, profits or purchases of the franchise business.

14 Ill. Admin. Code § 200.104. In addition, § 200.105 explains:

(a) Any payment(s) in excess of $500 that is required to be paid by a franchisee to the franchisor or an affiliate of the franchisor constitutes a franchise fee unless specifically excluded by Section 3(14) of the Act.

. . .

(c) A payment made to a franchisor or affiliate for equipment, materials, real estate services, or other items shall not constitute a franchise fee if the purchase of the items is not required by the franchisor or the franchisee is permitted to purchase the items from sources other than the franchisor or its affiliates and the item is available from such other sources.

■ These definitions are obviously sweeping in their scope. The sum of $500, all that has to be paid over the entire life of a franchise, is less than small change for most businesses of any size. Furthermore, the regulations explicitly allow this small amount to be paid either in a lump sum or in installments, to be "definite or indefinite" in amount, and to be "partly or wholly contingent" on different, possibly quite unpredictable, variables. In short, the Illinois legislature and the designated Administrator, the Attorney General, could not have been more clear. They wanted to protect a wide class of dealers, distributors, and other "franchisees" from specified acts, such as termi-nations of their distributorships (franchises) for anything less than "good cause." They might have done so because it is hard to quantify the level of a franchisee's investment in the products or services of the franchisor, and easy for the franchisor to reap the benefits of those investments without full compensation if it can terminate the relationship essentially at will. Or they might have done so based on an empirical assumption (that may or may not be correct—we express no view on the point) that franchisees tend to be weak and in need of a legislative boost in bargaining power. Or the legislature and the Attorney General might have been engaged in wealth distribution, not considering the indirect impact on Illinois citizens. (The Act describes its purpose as being to furnish prospective franchisees with information, and to protect franchisees and franchisors by providing a better understanding of the business and legal relationship between franchisees and franchisors. 815 ILCS 705/2(2).) The reasons do not matter. What does matter to this case is that these definitions under Illinois law were binding on the district court and they are binding on us. That is not, incidentally, because the distributorship agreement says so. To the contrary, Article XIII para. 6 of the agreement says that it is to be governed by the laws of Texas. But Illinois, like many other states, has made it clear that parties cannot opt out of the coverage of the Act for Illinois franchisees. 815 ILCS 705/41; *Hengel, Inc. v. Hot 'N Now, Inc.*, 825 F.Supp. 1311, 1315–16 (N.D.Ill. 1993); cf. *Wright–Moore Corp. v. Ricoh Corp.*, 908 F.2d 128, 132 (7th Cir.1990) (Indiana law); *Morley–Murphy Co. v. Zenith Elec. Corp.*, 142 F.3d 373, 381 (7th Cir.1998) (Wisconsin law). (The parties have not addressed the possible significance of the fact that some portion of To–Am's territory was in Indiana, so neither shall we.) We therefore turn to MCFA's specific arguments under the Illinois Act.

■ MCFA begins with the factual assertion that To–Am was not required to pay it anything under the terms of the agreement, and certainly no form of franchise fee. It is true that the agreement has no article entitled "Periodic Franchise Payments," but the

Illinois statute and administrative regulations we have just quoted make it clear that no such precision is required. Article III para. 14 says that the dealer was required to "[m]aintain an adequate supply of current [MCFA] sales and service publications." The jury was entitled to view this as an indirect fee or charge for the right to enter into the business of distributing MCFA lift trucks, which was payable over time, and which exceeded the statutory floor of $500 by a factor of more than three. Given MCFA's control of the supply of these manuals, it easily could have built a franchise fee into their price. MCFA argues that To–Am might have been able to procure the required manuals in some way other than ordering them from MCFA and paying for them, such as by purchasing them from another dealer or simply photocopying them, but the jury heard evidence both ways and it was not required to accept MCFA's view of the obligation. (Purchasing the manuals from another dealer might also fall within the rule that the price of any required item obtainable only from "the franchisor or its affiliates," Ill. Admin. Code § 200.105(c) (emphasis added), also counts as an indirect franchise fee, if that item is not otherwise excluded from the statutory definition.)

Relying on our decision in *Wright–Moore, supra,* 908 F.2d 128, MCFA invited the district court and invites us to import into the Illinois statute a rule from Indiana franchise law to the effect that ordinary business expenses cannot qualify as franchise fees, which instead must be "unrecoverable investments." First, we note that the *Wright–Moore* decision stressed the highly fact specific nature of the question whether alleged business expenses are franchise fees, rejecting summary judgment on the question. *Id.* at 136. This underscores the importance in our case of deference to the jury's finding. Second, as the district court noted, there are differences in language between the Illinois statute and the Indiana one that affect our analysis. For example, in *Wright–Moore* the court noted an exception under the Indiana law for "the purchase or agreement to purchase goods at a bona fide wholesale price." Ind.Code § 23–2–2.5–1(i)(3). See *Wright–Moore,* 908 F.2d at 135–36. In contrast, the

Illinois exception is written more narrowly, to cover "the purchase or agreement to purchase goods for which there is an established market at a bona fide wholesale price." 815 ILCS 705/3(14)(c) (emphasis added). There was no evidence presented of an open or established market for MCFA's proprietary manuals. Finally, and most importantly, unlike Illinois, Indiana had no administrative regulations broadly defining indirect franchise fees. While the Indiana rule may be sensible, our task in diversity litigation is merely to enforce the law of the relevant state, not to recreate that state's law as we, another state, or a party might have created it as legislators. *American Home Assur. Co. v. Stone,* 61 F.3d 1321, 1328–29 (7th Cir. 1995); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). We therefore agree with the district court that the Illinois law and its implementing regulations do not contain any requirement that franchise fees must be "unrecoverable investments."

At the eleventh hour in the district court, and now again in this court, MCFA tried to argue that § 200.105(a) of the administrative regulations is invalid if by its own force it foreclosed inquiry into the question whether the payments were for an ordinary business expense made after the dealership was formed, as opposed to being for the right to enter into the business. The district court found that MCFA had waived this argument by failing to include it in its renewed motion for summary judgment. MCFA retorts now that the argument was indeed present, buried in footnote 16 at page 6 of its June 27, 1996, reply brief. Such a truncated presentation will not do, however, as we have often noted in the analogous case of appellate briefs. E.g., *Estate of Phillips v. City of Milwaukee,* 123 F.3d 586, 597 (7th Cir.1997), cert. denied, —— U.S. ——, 118 S.Ct. 1052, 140 L.Ed.2d 115 (1998). In any event, MCFA's argument that the regulation precludes inquiry into whether a payment is for the right to enter a business or not does not do the regulation justice. What the regulation does is to make clear that a payment for the right to enter a business may be collected over a period of years, need not be definite in

amount, and may be indirect. Nothing in the Illinois Franchise Disclosure Act insists that all franchise fees must be paid up front, or not at all. The obligation to pay the indirect fees is contained in the initial dealership agreement here, which supports the district court's conclusion that a jury reasonably could regard the payments as compensation for the right to become a dealer.

Last, the district court mused that there might be some outer limit to the time period over which a fee might be spread, even though no such language appears in the statute. The court suggested that the statute might not be satisfied in a hypothetical case in which a dealer pays $10 a year to the manufacturer, and thus does not satisfy the statutory threshold of $500 until year 50. It was unnecessary to explore this line of inquiry in detail, both because the parties had assumed throughout the litigation that payments over time were acceptable and because To–Am's fees had actually reached more than $1,600 by the time of trial. The court's concern may be in some tension with the Attorney General's regulations, which expressly permit installment payments, indefinite in amount, contingent on future sales or profits. In such a vague arrangement, we can say only that there would be a question of fact whether it was certain enough that the payments would reach the $500 level for the contract to fall within the scope of the Act. That is not a problem in the case before us, and we therefore agree with the district court that MCFA was not entitled to judgment as a matter of law on this point.

### B. Damages

▮▮▮ MCFA moved under Rule 59 for a new trial or a remittitur of the jury's $1.525 million damage award after the trial. The district court denied the motion, and our review is for abuse of discretion only. See *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 106 F.3d 1388, 1397 (7th Cir. 1997). State substantive law determines whether the damage award was adequately supported by the evidence. See *id.*; *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 438, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). Under Illinois law, "where the existence of damages is established, 'the evidence need only tend to show a basis for the computation of damages with a fair degree of probability.'" *Medcom*, 106 F.3d at 1398, quoting *In re Busse*, 124 Ill.App.3d 433, 79 Ill.Dec. 747, 464 N.E.2d 651, 655 (1984); *LaSalle Nat'l Trust v. Board of Dir. of the 1100 Lake Shore Dr. Condominium*, 287 Ill. App.3d 449, 222 Ill.Dec. 579, 677 N.E.2d 1378, 1384 (1997). Where two experts differ the jury need not accept either's testimony in toto, but instead may choose a value within the range presented. It may also reduce an expert's damage estimate without invalidating the verdict. *F.L. Walz, Inc. v. Hobart Corp.*, 224 Ill.App.3d 727, 167 Ill.Dec. 42, 586 N.E.2d 1314, 1319 (1992); *Branum v. Slezak Constr. Co.*, 289 Ill.App.3d 948, 225 Ill.Dec. 88, 682 N.E.2d 1165, 1168 (1997).

MCFA may also be trying to argue under Rule 50 that it deserved judgment as a matter of law, based on an utter failure of proof of damages. We cannot tell from the record on appeal whether it actually made this point below or not, but a letter to this court after oral argument says that MCFA believes there was "no evidentiary basis upon which a reasonable juror could have calculated damages." Assuming (generously) that this point is not waived, we find it bizarre at best. MCFA's own expert testified to small, but plausibly non-zero, damages. To–Am predictably responds that the evidence was sufficient to support the jury's damage award. In addition, To–Am suggests that this court should reconsider, in light of *Gasperini*, its rule that a federal standard applies to Rule 50 sufficiency of the evidence determinations in diversity cases. We decline the invitation. As recently as 1994, in *Mayer v. Gary Partners & Co.*, 29 F.3d 330 (7th Cir.1994), the full court had the opportunity to look at this question and squarely decided to "adopt the federal reasonable-person standard across the board: pretrial, mid-trial, post-trial, and on appeal, for evaluating both the merits and the quantum of relief," in diversity as well as federal question cases. See *id.* at 335 and n. (indicating that the opinion had been circulated to all judges in active service under Seventh Circuit Rule 40(f), since renumbered to 40(e), and that no judge wished to rehear the case en banc). (We are aware that occasional opinions since *Mayer* have used language indicating that they were not applying a fed-

eral standard to this question. See, e.g., *Winger v. Winger*, 82 F.3d 140, 143 (7th Cir.1996); *Suzik v. Sea–Land Corp.*, 89 F.3d 345, 348 (7th Cir.1996). Nevertheless, the choice of standard was not dispositive in those cases, and they did not discuss *Mayer*. For that reason, we do not believe that these decisions cast any doubt on the analysis *Mayer* set forth at such great length.)

■ The district court carefully considered the jury's damage award, which was certainly generous, but it concluded in the end that the evidence adequately supported the award. We cannot say that decision was an abuse of discretion. The jury heard testimony from To–Am's expert, Fred Lieber, that the damages were somewhere between $2,167,600 and $2,590,100. Lieber described his assumptions and his methodology and explained how he arrived at his estimate of To–Am's damages. He made and presented additional calculations varying several assumptions, which formed the basis for his range of possible damages. In brief, Lieber's theory-derived from data obtained from Dick Todd, To–Am's president—was that To–Am was near the end of its period of "seeding the market," during which it had invested heavily in the company and reinvested all profits so as to develop Mitsubishi's (and thus To–Am's own) market share and customer base. (Testimony at trial showed that Mitsubishi forklifts, which occupied close to 0% of the local market when To–Am became a Mitsubishi dealer, accounted for around 13% of the local market when To–Am was terminated.) Lieber relied on the facts that many of To–Am's leasing customers held leases that were about to expire; that these customers were likely to enter new long-term leases through To–Am for new forklifts, which would give To–Am an increased stock of used equipment; and that To–Am enjoyed its higher profit margins on its activities of reselling, renting, leasing and repairing these used forklifts. MCFA's expert, Seth Palatnik, accepted Lieber's basic methodology; he just challenged certain assumptions and valuation decisions and opined that To–Am's damages were between zero and $36,000. His analysis was much less elaborate than Lieber's, though To–Am exaggerates slightly when it claims Palatnik's opinion boiled down to the conclusion that

Lieber's numbers, and profits, just looked too big to be real (especially given by how much they beat industry averages). The district court was on target, however, in finding that Palatnik "simply asserted that To–Am's future would be like its past; and to the extent To–Am's future differed from its past, then To–Am would be exactly like a normal (which is to say, median), forklift dealer," *To–Am Equip. Co v. Mitsubishi Caterpillar Forklift America, Inc.*, 953 F.Supp. 987, 996 (N.D.Ill. 1997), and in further criticizing Palatnik for not addressing Leiber's detailed and differentiated calculations. *Id.* at 997. The jury's award of $1.525 million more or less split the difference between the two experts' estimates, and thus easily fell within the range of valuation testimony presented. See *Medcom*, 106 F.3d at 1398; *Ransom v. A.B. Dick Co.*, 289 Ill.App.3d 663, 224 Ill.Dec. 753, 682 N.E.2d 314, 323 (1997); *Walz*, 167 Ill.Dec. 42, 586 N.E.2d at 1319. The jury was not obligated to follow one expert's theory right down the line and to the penny. Even if we shared the district court's skepticism about Lieber's rosy predictions, we cannot say that the court abused its discretion in finding the valuation not overly speculative and thus declining to order a new trial or remittitur.

The district court also properly rejected MCFA's attacks on To–Am's expert, in which MCFA appears to be making the argument that the expert was so far out of line that To–Am had the equivalent of no testimony at all on damages (and thus that MCFA is entitled to judgment as a matter of law under Rule 50). In MCFA's view, To–Am's expert should have used To–Am's "going concern" value after termination, rather than its "asset value." MCFA also criticizes the expert's assumption that To–Am would have no revenue at all from Mitsubishi after the termination. As To–Am points out, the first argument is practically masochistic. If the expert had calculated a going-concern value for To–Am without the franchise, he would have come up with a figure even lower than the asset value he used, and hence would have found more damages for To–Am. To–Am has been losing money since its termination, and this fact was discussed at trial. That means that the going-concern value was logically less than the asset value. MCFA's second argument is also unresponsive to To–Am's

theory. Even if To-Am's ongoing lease and repair business post-termination was contributing something to its gross income, that tells us nothing about the net income consequences of the termination. To–Am lost the MCFA dealer discount on parts, and it no longer had new forklifts to lease to its existing customers. This meant that its stock of used forklifts was shrinking as well. More fundamentally, the residual lease and repair operations would have had little if any effect on To–Am's asset value; the expert was therefore justified in disregarding them under his approach to the case.

Like many manufacturers, MCFA simply did not appreciate how vigorously Illinois law protects "franchisees." This does not mean that terminations are impossible, but it does mean that they usually must be the subject of negotiation unless the manufacturer is able to show "good cause." MCFA has conceded that it cannot meet that standard, and it did not litigate the case under that theory. We have considered its remaining arguments and find nothing that requires reversal. While we understand MCFA's concern that dealerships in Illinois are too easily categorized as statutory franchisees, that is a concern appropriately raised to either the Illinois legislature or Illinois Attorney General, not to this court. We therefore AFFIRM the judgment of the district court.