# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-4109

SOUND OF MUSIC CO.,

*Plaintiff-Appellant*,

*v.*

MINNESOTA MINING AND
MANUFACTURING CO.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 639—**John A. Nordberg**, *Judge.*

ARGUED SEPTEMBER 18, 2006—DECIDED FEBRUARY 13, 2007

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* When Minnesota Mining and Manufacturing Company, more commonly known as "3M", decided to end its involvement in the background music business, 3M's dealers, including the Sound of Music company, were understandably concerned. In this suit, we consider whether Sound of Music has legal recourse for 3M's decision to terminate the parties' background music business relationship. We conclude that 3M did not breach its contract with Sound of Music, as the contract allowed 3M to terminate the agreement by providing Sound of

Music twelve months' advance written notice of its intention to leave the background music business, as it did here. Because we also find that Sound of Music cannot obtain relief under either the Illinois or Minnesota franchise statutes, we affirm the district court's grant of summary judgment in favor of 3M. In addition, we affirm the district court's decision to deny Sound of Music leave to file a second amended complaint to add a claim under the Illinois Consumer Fraud Act because the claim would not survive a motion for summary judgment.

## I. BACKGROUND

3M, a diversified company based in Minnesota with thousands of products, was once in the background music business. In that business, 3M supplied pre-recorded and satellite-transmitted background music, as well as the equipment that played the music. The Sound of Music company, founded in 1973 by former 3M employee Richard Cushing, became one of many businesses that marketed and sold 3M's background music products to end users, including businesses which played the background music in their stores. Sound of Music had its offices in Illinois but had contracts with businesses and stores throughout the country, including in Minnesota.

Sound of Music and 3M had several agreements governing their relationship. On October 14, 1993, 3M terminated an agreement the parties had signed in 1988. The parties' next agreement, executed on May 5, 1995, plays a central role in this case. Under the 1995 agreement, Sound of Music was a non-exclusive distributor of 3M background music and background music equipment. The 1995 agreement provided that it would continue "until December 31, 1999, unless earlier terminated by either party as provided herein."

As in many industries, the technology in the background music business has changed over the years. When Sound of Music and 3M first began their relationship, background music was supplied to end users through magnetic tapes, a 3M product. By the late 1980s, the industry had moved away from magnetic tapes, and suppliers instead used an analog satellite signal to transmit music. 3M leased satellite space from a North Carolina company to broadcast the signal for end users, and 3M provided equipment that allowed end users to convert the analog signal into music that could be played in their stores.

During the 1990s, 3M became concerned that the industry was shifting from analog to digital technology. As a result, it believed that it would incur significant costs if it remained in the background music business. In 1997, 3M asked Donald Will, one of its employees, to evaluate the company's background music business. Will's team concluded that: (1) growth of the background music business beyond the current satellite contract would not be wise because 3M employed aging technology; (2) no serious potential buyer for the background music business existed; and (3) shutting down the background music project quickly would give 3M's dealers at least twelve months' notice and would enable the company to use gains from the sale of another division to offset expected losses from a rapid shutdown. On October 21, 1997, Will completed a report and recommended a rapid shutdown of 3M's background music business. Shortly thereafter, 3M decided to follow his recommendation. On November 18, 1997, 3M sent a letter to Sound of Music stating that 3M would terminate its involvement in the background music business as of December 31, 1998. By its terms, the agreement would not have expired until December 31, 1999.

Three days after receiving the letter, Sound of Music contacted its attorney for advice. Sound of Music was concerned about the substantial investment it had placed in the background music business. During the time the 1988

agreement governed, 3M leased "downlink equipment" to Sound of Music and other dealers. Sound of Music then subleased the equipment to its customers, who used it to receive and play the satellite music in their stores. By October 1997, however, Sound of Music had purchased the downlink equipment from 3M at a cost of approximately $600,000 and owned it outright. In the weeks and months following receipt of the termination letter, Sound of Music's counsel researched options including possible legal remedies Sound of Music might have against 3M for the termination of the 1995 Agreement. Ultimately, in April 1998, Sound of Music was sold to Muzak, another background service provider.

Sound of Music filed a complaint against 3M on February 2, 1999, alleging claims for breach of contract, violation of the Illinois Franchise Disclosure Act, violation of the Minnesota Franchise Act, and equitable recoupment. The district court granted summary judgment in favor of 3M on all counts and denied Sound of Music's request for leave to file a second amended complaint. Sound of Music appeals.

## II.  ANALYSIS

### A.  Summary Judgment

#### 1.  Standard of Review

We review a district court's grant of summary judgment de novo. *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 988 (7th Cir. 2006). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

As an initial matter, we note that contrary to Sound of Music's assertion, the district court did not need to explic-

itly reconcile all the differences between 3M's Statement of Undisputed Facts and Sound of Music's response to 3M's Statement when it ruled on 3M's motion for summary judgment. Instead, the district court needed only to decide whether, based on the evidence in the record, a material dispute of fact existed that required trial. *See* Fed. R. Civ. P. 56(c); *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The district court did so in a thorough opinion and concluded that there was no genuine issue of material fact. Sound of Music maintains that this decision was erroneous, as it contends summary judgment should not have been granted on its claims for breach of contract, violation of the Illinois Franchise Disclosure Act, and violation of the Minnesota Franchise Act. We now address these arguments.

### 2. Breach of Contract Claim

Sound of Music first argues that the district court improperly granted summary judgment on its claim that 3M breached a contract between the parties when 3M terminated the 1995 agreement. Although the parties do not discuss whether Minnesota or Illinois law applies to this claim, the 1995 agreement contains a provision stating that Minnesota law will apply to any "questions, claims, disputes, or litigation arising from or related to this Agreement." In a suit where the federal court's subject matter jurisdiction is based on diversity, such as this one, the forum state's choice of law rules determine the applicable substantive law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704-05 (7th Cir. 2004). Illinois courts generally adhere to a contract's choice of law provisions. *Thomas*, 381 F.3d at 705 (stating Illinois respects a contract's choice of law clause if the contract is valid and the law does not contradict Illinois's fundamental public policy); *Kohler v. Leslie*

*Hindman, Inc.*, 80 F.3d 1181, 1184-85 (7th Cir. 1996). Because we see no reason why we should not recognize the parties' choice of Minnesota law as we analyze whether a breach of the contract took place, we will apply Minnesota law to this claim.

To prevail on a breach of contract action under Minnesota law, a plaintiff must prove: (1) the formation of a contract; (2) performance by the plaintiff of any conditions precedent to the right to demand performance by the defendant; (3) breach of the contract by the defendant; and (4) damages resulting from that breach. *Indus. Rubber Applicators, Inc. v. Eaton Metal Prods. Co.*, 171 N.W.2d 728, 731 (Minn. 1969); *D.H. Blattner & Sons, Inc. v. Firemen's Ins. Co.*, 535 N.W.2d 671, 675 (Minn. Ct. App. 1995). The parties agree that the 1995 Agreement constituted a valid contract and that Sound of Music had performed its obligations under the contract. They dispute, however, whether 3M's termination of the parties' relationship constituted a breach of the 1995 agreement.

The 1995 agreement provided that it was to continue until December 31, 1999. The agreement also provided, however, that it could be terminated sooner if certain conditions were met. In particular, the agreement's termination provision stated:

> 15.0. <u>TERMINATION</u>. This Agreement may be terminated by the parties as follows:
>
> A. Either 3M or Dealer may terminate this Agreement if the other materially breaches the Agreement by giving ninety (90) days' written notice . . . .
>
> B. By either party immediately upon written notice by one party to the other, if that other party files or has filed against it a petition under any bank-

ruptcy act, has a receiver appointed for any of its assets, . . . .

C.  In the event of bankruptcy by Dealer or if Dealer is unable to perform its material obligations to end users or to 3M, 3M may substitute for Dealer and fulfill its obligations under the music service agreement. In such event end user will make payments directly to 3M.

D.  Upon 3M's exit from the business by sale, divestiture, assignment of assets, or any other manner of exit, or any other material transfer of ownership of the Equipment or Music Service portion of either Party's business upon twelve (12) months' advance written notice.

By providing Sound of Music with over twelve months' advance written notice that it was exiting the background music business, 3M contends it properly terminated the agreement pursuant to section D of paragraph 15.0. Sound of Music, however, argues that 3M did not terminate the relationship in a manner allowed by the agreement.

### a.  Unilateral termination

Sound of Music first argues that section 15.0(D) did not allow 3M to unilaterally terminate the agreement. Instead, Sound of Music contends that both parties must agree to end the relationship for termination under section 15.0(D) to be proper. To support its argument, Sound of Music points first to the introductory language in paragraph 15.0, which provides that the agreement may be terminated by "the parties" (plural, Sound of Music emphasizes) for the reasons that follow it. Sound of Music also points to sections A and B of paragraph 15.0, which specifically provide that

"either" party may terminate the agreement. Because the "either party" language does not appear in section D, and the introductory language to the entire paragraph provides that termination may occur by "the parties," Sound of Music concludes that termination under 15.0(D) can only occur if *both* parties agree to terminate the agreement.

We do not read the agreement as Sound of Music does. First, the introductory "by the parties" phrase does not contain any limitation on which party may use the provisions that follow it, and neither the paragraph's introductory language nor section 15.0(D) states that consent of both parties is necessary for proper termination. In addition, that termination pursuant to section 15.0(D) is contingent upon sufficient advance notice suggests that consent is not required, as advance notice would not seem critical if a party could simply decline to agree to a proposed termination.

At best, the language in section 15.0(D) is ambiguous, meaning that it is susceptible to more than one meaning. *See Hous. and Redev. Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 337 (Minn. 2005). When a contract is ambiguous, a court may examine extrinsic evidence to ascertain the meaning of the contract. *Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005); *Norman*, 696 N.W.2d at 337. If the extrinsic evidence is conclusive, the proper reading of the contract is not a question of fact. *See Hickman*, 695 N.W.2d at 369.

Here, the extrinsic evidence conclusively establishes that 3M could unilaterally terminate the contract upon twelve months' written notice if it exited the background music business. The 1995 agreement, and its termination provisions in particular, resulted from significant negotiations between the parties. Unlike the parties' prior agreement signed in 1988, 3M included in its draft of the 1995 agreement a specific date by which the agreement would expire

on its own terms. 3M's draft also included a provision stating that it could terminate the agreement if it exited the business upon ninety days' advance notice. These proposals worried Sound of Music, as it was concerned that 3M might leave the background music business (precisely what happened here). So Sound of Music asked that the provision allowing 3M to terminate the agreement by exiting the business be removed entirely, or at least that the agreement provide that sixty months' notice was required to terminate the contract if 3M exited the business. 3M, however, would not agree. The 1995 agreement reflects that the parties ultimately agreed that 3M could terminate the agreement if 3M provided twelve months' advance notice.

### b. Exiting "the business"

Next, Sound of Music contends that 3M did not exit "the business", as termination pursuant to section 15.0(D) required. The agreement does not define the term, "the business", and Sound of Music maintains that "the business" should be read to include more product areas than those addressed in the 1995 agreement.[1]

---

[1] Paragraph 1.0 of the 1995 agreement provided that Sound of Music was a non-exclusive distributor of 3M Sound Products Satellite Reception Equipment and/or 3M Brand Satellite Music Service. The text of paragraph 1.0 provides:

DEALER RELATIONSHIP. This Agreement defines the dealer relationship between 3M and Dealer. 3M appoints Dealer as a non-exclusive distributor of 3M brand Sound Products Satellite Reception Equipment ("Equipment") and/or 3M Brand Satellite Music Service ("Music Services"). For the purposes of this Agreement "Music Services" shall be defined as 3M providing a multi-channel signal from a designated satellite containing music and/or commercial messages to specified receiving

(continued...)

In particular, Sound of Music contends that the 1995 agreement should be read to allow for termination only if 3M terminated its entire "InTouch business." This division included not just background music but also wireless communications, for example. Sound of Music draws its conclusion from the termination letter it received from 3M, which stated in part:

> For the past several months, 3M has been carefully evaluating its InTouch business. We have decided that a change in strategic business direction is necessary. As a result, we will terminate our DBS broadcast business on Dec. 31, 1998 . . . . We will continue to operate our other In-Touch Businesses.

"DBS" was shorthand for "direct broadcast satellite," and Sound of Music acknowledges that the letter informed Sound of Music that 3M was ending its satellite background music services business.

Significantly, the only subject of the agreement was the background music services business. The agreement makes no mention of the InTouch line of business (nor of any of 3M's thousands of other products). We find nothing in the agreement or anywhere else in the record to indicate that the parties intended to make 3M's ability to terminate by exiting "the business" contingent on businesses which were not the subject of the agreement. Because Sound of Music acknowledges that 3M gave it at least twelve months'

---

[1] (...continued)

equipment and satellite dishes at various designated customer locations of Dealer. 3M agrees to provide Music Services and Equipment to Dealer according to the terms and conditions stated on 3M's price pages for the purpose of Dealer providing Equipment and Music Service to end-user customers. Dealer agrees to distribute 3M Music Services and Equipment.

written notice that it was terminating its background music business, 3M properly terminated the agreement pursuant to section 15.0(D). Summary judgment in favor of 3M on the breach of contract claim was therefore proper.

### 3.  Illinois Franchise Disclosure Act Claim

Sound of Music next argues that the entry of summary judgment on its claim under the Illinois Franchise Disclosure Act ("Illinois Franchise Act") was erroneous.[2] The Illinois Franchise Act provides that a franchisor may not terminate a franchise located in Illinois prior to the expiration of its term unless "good cause" exists to do so. 815 Ill. Comp. Stat. 705/19(a) (2000). But the Act also provides that actions thereunder must be brought within one year "after the franchisee becomes aware of facts or circumstances reasonably indicating that he may have a claim for relief in respect to conduct governed by" the Act. 815 Ill. Comp. Stat. 705/27. The district court granted summary judgment on Sound of Music's claim under the Illinois statute after

---

[2] Although the 1995 agreement provided that it would be governed by Minnesota law, Sound of Music's offices were all in Illinois. The Illinois franchise statute contains an anti-waiver provision. *See* 815 Ill. Comp. Stat. 705/41 ("Any condition, stipulation, or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act or any other law of this State is void."). Through this provision, "Illinois, like many other states, has made it clear that parties cannot opt out of the coverage of the act for Illinois franchisees." *To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.,* 152 F.3d 658, 662 (7th Cir. 1998) (considering Illinois franchisee's claim under the Illinois franchise statute even though parties' agreement stated Texas law governed). 3M does not contend that the agreement's choice of law clause means we cannot consider Sound of Music's claim under the Illinois Franchise Act.

concluding that the statute of limitations had expired before Sound of Music filed suit.

Although Sound of Music received notice in November 1997 that 3M would cease its background music services business at the end of 1998, Sound of Music did not file its complaint until February 2, 1999. Sound of Music acknowledges that it did not bring its claim until more than a year after it received the notice of termination, but it maintains that an issue of fact exists as to whether facts or circumstances "reasonably indicated" to Sound of Music that it might have a claim under the Illinois Franchise Act before February of 1998 (i.e., one year before it filed suit).

We disagree. Our decision in *Pyramid Controls Inc. v. Siemens Industrial Automation, Inc.*, 172 F.3d 516 (7th Cir. 1999), governs here, and it demonstrates that the district court's grant of summary judgment was proper. In *Pyramid Controls*, a manufacturer sent the plaintiff distributor a one-year notice that it was terminating their relationship, pursuant to a clause in the distribution agreement. 172 F.3d at 517. Shortly after learning of the impending termination, the plaintiff's president consulted his company's attorney. *Id.* The attorney considered various causes of action, although not one under the Illinois franchise statute, and then told the plaintiff it had no legal remedy. *Id.* More than a year later, when a different attorney concluded a viable claim under the Illinois franchise statute existed, the plaintiff filed suit. *Id.* at 518. Although the plaintiff contended actual knowledge of an Illinois Franchise Act claim was necessary before a business could become "aware of facts or circumstances reasonably indicating that he may have a claim for relief" under the statute, we disagreed. *Id.* at 518-19. An examination of the statutory language and Illinois state court decisions, including *Brenkman v. Belmont Marketing, Inc.,* 410 N.E.2d 500 (Ill. App. Ct. 1980), led us to conclude that "Illinois courts have decided that knowledge of facts reasonably indicating a

claim plus consultation with an attorney is enough" to trigger the statute of limitations clock. *Pyramid Controls*, 172 F.3d at 519.

No Illinois decision after *Pyramid Controls* suggests our conclusion was incorrect, and Sound of Music does not press us to overturn that decision. Instead, it argues first that it was reasonable for its attorneys to take slightly over two months to review many years of documents to find support for a claim under the Illinois franchise statute. (Sound of Music would like the statute of limitations clock to begin ticking in February 1998, a little over two months after it received 3M's notice of termination and exactly one year before it filed suit.) Unfortunately for Sound of Music, *Pyramid Controls* instructs that the "reasonableness" of the attorneys' review is irrelevant here. Instead, the statute of limitations began to run when Sound of Music had knowledge of facts reasonably indicating a claim and it had consulted its attorney. There is no requirement that the attorney know a viable claim exists. *See id.* at 519 (rejecting argument that actual knowledge of claim under Illinois franchise statute necessary to trigger statute of limitations).

In this case, Sound of Music acquired the requisite awareness in November 1997 when it received the termination notice from 3M. That letter stated 3M's intent to terminate the 1995 agreement because 3M intended to leave the background music business. Sound of Music knew sufficient facts reasonably indicating that a claim under the Illinois Franchise Act existed in November 1997, more than a year before it asserted this claim against 3M.

Also in November 1997, only three days after Sound of Music received 3M's termination letter, Sound of Music consulted its attorney seeking advice. After reviewing the letter, the attorney discussed with Sound of Music the possibility of continuing the business through obtaining

satellite services so that customers of Sound of Music could be serviced and the business could continue. This attorney, the same attorney who had represented Sound of Music when it signed the 1988 agreement with 3M, also directed the research of possible legal remedies against 3M. Thus, Sound of Music had facts reasonably indicating a claim under the Illinois Franchise Act and presented these facts to its attorney in November 1997, and it did not file suit until more than a year later.

In a separate argument, Sound of Music contends that the statute of limitations should have been triggered not when it had facts reasonably indicating a claim and presented them to its attorney, but only when its damages were ascertainable. Sound of Music contends its damages from the termination were not ascertainable until the spring of 1998, when it sold its business. No case to which Sound of Music points supports its argument. First, in *Profit Management Development, Inc. v. Jacobson, Brandvik, and Anderson, Ltd.*, 721 N.E.2d 826 (Ill. App. Ct. 1999), the Illinois Appellate Court stated that although actual damages were an essential element of the legal malpractice claim at issue, damages were speculative, and thus prevented a trigger of the statute of limitations, "only if their existence itself is uncertain and not if the amount is uncertain or yet to be fully determined." 721 N.E.2d at 842. Similarly, in *Midwest Commerce Banking Co. v. Elkhart City Centre*, 4 F.3d 521 (7th Cir. 1993), we stated that damages "are for people who have been harmed," and that the statute of limitations on the tort action at issue would not begin to run until harm occurred. 4 F.3d at 526.

In this case, Sound of Music knew in November 1997 of the consequences of the agreement's termination. Indeed, it consulted its attorney almost immediately to investigate possible legal remedies for 3M's decision to terminate the parties' relationship. Even if Sound of Music did not know the exact amount of its damages in November 1997, it knew

at that time that it had been "harmed." The one-year statute of limitations began to run in November 1997 when Sound of Music acquired facts reasonably indicating a claim under the Illinois franchise statute and consulted with its attorney, and the district court correctly granted summary judgment on this claim because Sound of Music did not file its claim until more than a year later. In light of our determination that Sound of Music's Illinois Franchise Act claim was untimely, we need not address 3M's additional arguments in support of the district court's decision to grant summary judgment on this claim.

### 4. Minnesota Franchise Act Claim

Sound of Music also disagrees with the district court's decision to grant summary judgment in favor of 3M on Sound of Music's claim under the Minnesota Franchise Act. Like the Illinois Franchise Disclosure Act, the Minnesota Franchise Act provides that a franchise may not be terminated "except for good cause." Minn. Stat. § 80C.14, Subd. 3(b) (2006). Sound of Music maintains 3M violated this provision by terminating the 1995 agreement without good cause.

3M raises multiple arguments in support of the district court's decision, including its contention that Sound of Music waived any right it may have had to claim it was a "franchisee" within the meaning of the Minnesota Franchise Act. Specifically, 3M points to paragraph 4.0 of the 1995 Agreement, which states: "The relationship between 3M and [Sound of Music] is that of a supplier to its distributor. [Sound of Music] is *not* an agent, partner, involved in a joint venture with, or *franchisee* of 3M." (Emphasis added). But the Minnesota Court of Appeals has stated that the requirements in the Minnesota Franchise Act, not the labels used by the parties, determine whether a franchise-franchisee

relationship exists. *Upper Midwest Sales Co. v. Ecolab, Inc.*, 577 N.W.2d 236, 241 (Minn. Ct. App. 1998).[3]

In any event, resolution of the effect of paragraph 4.0 is not necessary. We conclude that even if the Agreement did not preclude Sound of Music from bringing a claim under the Minnesota Franchise Act, summary judgment was proper because the agreement between 3M and Sound of

---

[3] Sound of Music also contends that the Minnesota Franchise Act's anti-waiver provision means paragraph 4.0 should not be given effect. The statute provides:

> Any condition, stipulation or provision, including any choice of law provision, purporting to bind any person who, at the time of acquiring a franchise is a resident of this state . . . or purporting to bind a person acquiring any franchise to be operated in this state to waive compliance or which has the effect of waiving compliance with any provision of section 80C.01 to 80C.22 or any rule or order thereunder is void.

Minn. Stat. § 80C.21 (2006). 3M argues that this provision does not help Sound of Music, as by its terms, the Minnesota Franchise Act's anti-waiver provision only applies to franchise owners who were residents of Minnesota at the time of acquisition or to persons acquiring franchises to be operated in Minnesota. *See also Martin Investors, Inc. v. Vander Bie*, 269 N.W.2d 868, 872 (Minn. 1978) ("Chapter 80C was adopted in 1973 as remedial legislation designed to protect potential franchisees within Minnesota from unfair contracts and other prevalent and previously unregulated abuses in a growing national franchise industry."). Sound of Music, an Illinois corporation, was never a Minnesota resident. However, Minnesota courts have not discussed whether a business such as Sound of Music that sold to customers in Minnesota constitutes a "franchise to be operated in this state" if the other requirements to establish a franchise-franchisee relationship are met. Because we conclude that Sound of Music has not satisfied the statutory requirements necessary to establish a franchise agreement, we need not address this argument.

Music was not a "franchise" under the Act. Under the Minnesota Franchise Act, a "franchise" is "a contract or agreement, either express or implied, whether oral or written, for a definite or indefinite period, between two or more persons":

> (i) by which a franchisee is granted the right to engage in the business of offering or distributing goods or services using the franchisor's trade name, trademark, service mark, logotype, advertising, or other commercial symbol or related characteristics;

> (ii) in which the franchisor and franchisee have a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise; and

> (iii) for which the franchisee pays, directly or indirectly, a franchise fee.

Minn. Stat. § 80C.01, Subd. 4(a)(1).[4] All three elements must be present for a franchise to fall within the Minnesota Franchise Act's purview. *OT Indus., Inc. v. OT-tehdas Oy Santasalo-Sohlberg Ab*, 346 N.W.2d 162, 166 (Minn. Ct. App. 1984).

In this case, Sound of Music has not demonstrated that a genuine issue of material fact exists as to whether it paid a franchise fee for the agreement between Sound of Music and 3M. Under the Minnesota Franchise Act, a "franchise fee" is any fee a franchisee must pay or agrees to pay "for the right to enter into a business or to continue a business under a franchise agreement." Minn. Stat. § 80C.01, Subd. 9. Such a fee includes "the payment either in lump sum or by installments of an initial capital investment fee,

---

[4] The Minnesota Franchise Act sets forth additional circumstances under which a franchise can occur that are not relevant here. *See* Minn. Stat. § 80C.01, Subd. 4(a)(2)-(4).

any fee or charges based upon a percentage of gross or net sales whether or not referred to as royalty fees, any payment for goods or services, or any training fees or training school fees or charges." *Id.*[5]

Sound of Music maintains in this suit that 3M's termination of the 1995 agreement violated the Minnesota Franchise Act, yet it does not contend that it paid a franchise fee for the agreement the parties entered into in 1995. Nor could it succeed on such an argument. The 1995 agreement in the record makes no mention of a franchise fee or any fee that Sound of Music had to pay for the right to enter into or continue business with 3M. And, notably, Sound of Music does not contend that any evidence in the record indicates it paid a franchise fee for the 1995 agreement.

Instead, Sound of Music apparently contends that a $2400 "dealer reception fee" it paid pursuant to the 1988 agreement constituted a franchise fee sufficient to establish that Sound of Music was a 3M franchisee at the time 3M terminated the 1995 agreement. It is undisputed, however, that in 1993, 3M terminated the 1988 agreement. (The propriety of that termination is not at issue in this suit.) The record is also clear that the parties negotiated the 1995 agreement as a stand-alone contract. Moreover, there is no evidence in the record that either party considered the 1995 agreement a renewal or extension of an earlier agreement.

---

[5] The statute also excludes from the definition of "franchise" any agreement "whereby the franchisee is required to pay less than $100 an annual basis." Minn. Stat. § 80C.01, Subd. 4(c). The Supreme Court of Minnesota has interpreted this exclusion to apply only when a manufacturer sells directly to the ultimate user or consumer. *Current Tech. Concepts, Inc. v. Irie Enters., Inc.*, 530 N.W.2d 539, 544 (Minn. 1995) (finding one-time $125,000 payment constituted franchise fee under Minnesota Franchise Act). Sound of Music sold to end users under the agreement at issue, and 3M does not argue in its brief that this exclusion applies in this case.

In other words, we have no reason to believe that the terms of the 1988 agreement had any bearing on the 1995 agreement. Sound of Music also does not point us to any evidence indicating that a new dealer who sought to distribute 3M's background music in 1995 would need to pay a "dealer reception fee" for the right to enter into this business.

Moreover, we have doubts that the "dealer reception fee" paid pursuant to the terminated 1988 agreement constituted a "franchise fee" in 1988. Not all payments made by a purported franchisee over the course of a business relationship constitute franchise fees. Instead, only fees paid for the "right" to enter into a business or the "right" to continue a business qualify. *See* Minn. Stat. § 80C.01, Subd. 9. Ordinary business expenses, for example, do not constitute franchise fees under the Minnesota Franchise Act. *OT Indus.,* 346 N.W.2d at 167; *RJM Sales & Mktg., Inc. v. Banfi Prods. Corp.*, 546 F. Supp. 1368, 1373 (D. Minn. 1982). Agreements to purchase goods at a bona fide wholesale price, Minn. Stat. § 80C.01, Subd. 9(a), and reasonable minimum purchase commitments are also not franchise fees. *Upper Midwest Sales Co. v. Ecolab, Inc.*, 577 N.W.2d 236, 241-43 (Minn. Ct. App.1998); *Banbury v. Omnitrition Int'l Inc.*, 533 N.W.2d 876, 882 (Minn. Ct. App.1995); *Am. Parts Sys., Inc. v. T & T Auto., Inc.*, 358 N.W.2d 674, 676-77 (Minn. Ct. App. 1984).

Sound of Music signed its first agreement to distribute 3M's background music in 1973, and there is no suggestion that Sound of Music paid a franchise fee at that time. When 3M began using a satellite signal instead of magnetic tapes to supply the music, the parties signed a new agreement. This agreement, signed in 1988, is entitled the "3M Satellite Network/Dealer Lease Agreement." The 1988 agreement states that 3M agreed to lease satellite reception equipment to Sound of Music "for the purpose of subleasing to end customers" according to prices on an attached price schedule. Although this schedule listed an "Entry Fee (One

Time)" of $2400, the text of the agreement suggests that this was a fee charged to dealers for the space 3M leased on the satellite that transmitted music signals, not a fee for the "right to enter" or continue in the background music business with 3M. There is no indication, for instance, that 3M retained a portion of this fee beyond that which it paid to the satellite company or that it charged an above-market rate. *Cf. Upper Midwest Sales Co.*, 577 N.W.2d at 242 (finding no franchise fee where there was "no evidence that the [minimum purchase commitments] were not at the ordinary, wholesale price or that the distributors were required to purchase unreasonable amounts of inventory").

We conclude that the record does not support Sound of Music's argument that it paid a franchise fee for the 1995 agreement. As a result, the agreement between Sound of Music and 3M was not a franchise agreement, and summary judgment on Sound of Music's claim under the Minnesota Franchise Act was proper.

## B. Denial of Leave to File Second Amended Complaint

Finally, Sound of Music contends that the district court should have granted its motion for leave to file a second amended complaint to add a new claim under the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Consumer Fraud Act"), 815 Ill. Comp. Stat. 505/2. We review a district court's decision to deny leave to file an amended complaint for abuse of discretion. *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 925 (7th Cir. 2004).

Although Federal Rule of Civil Procedure 15(a) instructs that leave to amend shall be freely given "when justice so requires," a district court may deny a plaintiff leave to amend if "there is undue delay, bad faith[,] or dilatory motive . . . [, or] undue prejudice to the opposing party by

virtue of allowance of the amendment, [or] futility of amendment." *Park v. City of Chi.*, 297 F.3d 606, 612 (7th Cir. 2002) (citing *Ferguson v. Roberts*, 11 F.3d 696, 706 (7th Cir. 1993)). If the amended claim would not survive a motion for summary judgment, the amendment is futile. *Bethany Pharmacal Co. v. QVC, Inc.*, 241 F.3d 854, 861 (7th Cir. 2001). In this case, the district court found the request untimely and determined that the amendment would be futile.

Sound of Music did not file its request until after discovery had closed. Nonetheless, Sound of Music contends that any untimeliness should not bar its request because it did not seek additional discovery to support its Illinois Consumer Fraud Act claim. As a result, it argues, 3M was not harmed by any delay in bringing this claim.

On this record, however, we agree with the district court that the amendment would have been futile in light of the lack of evidence to support Sound of Music's proposed claim under the Illinois Consumer Fraud Act. The Illinois Consumer Fraud Act prohibits:

> Unfair . . . or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact . . . in the conduct of any trade or commerce.

815 Ill. Comp. Stat. 505/2. Accordingly, Sound of Music needed to establish the following elements to succeed on its proposed claim: (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) that the deception occur in a course of conduct involving trade and commerce; and (4) actual damage to the plaintiff; (5) proximately caused by the

deception. *See Oliveira v. Amoco Oil* Co., 776 N.E.2d 151, 160 (Ill. 2002); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). Sound of Music is correct that unlike a common law fraud claim, a successful claim under the Illinois Consumer Fraud Act does not require that the plaintiff have relied on the deception. *See Connick*, 675 N.E.2d at 593; *Siegel v. Levy Org. Dev. Co., Inc.,* 607 N.E.2d 194, 198 (Ill. 1992).

The evidence to which Sound of Music points does not suggest that 3M committed a deceptive act or practice, let alone that 3M intended that Sound of Music rely on any deception instead of on the agreement's text providing that it would expire on its own terms on December 31, 1999. Sound of Music's proposed claim is grounded in 3M statements that 3M had a contract with a projected orbital life to the year 2005 (a true statement) and that it had a plan to "provide service into the twenty-first century." In essence, Sound of Music contends that 3M made statements such as these to induce Sound of Music into signing the 1995 agreement and to create a perception that Sound of Music could comfortably make substantial capital purchases of equipment, when 3M actually knew it would leave the background music business before Sound of Music signed the agreement in 1995. *See* Proposed Second Am. Compl. ¶ 65 ("Although [Sound of Music] was first notified of the decision to terminate the contract in 1997, the decision to terminate the contracts of the dealers was made well prior to November 1997.").

No evidence in the record supports this assertion. Rather, all the evidence in the record indicates that 3M did not initiate its review of the viability of its background music business until 1997, two years after Sound of Music had signed the agreement, and that 3M made its decision to leave the background music business in November 1997. Similarly, at the time 3M made statements that it had a plan to provide service into the next century, it had such a plan, and it did not decide to leave the background music

business until several years later. *Cf. Connick*, 675 N.E.2d at 594 (complaint pled deceptive act where it alleged that manufacturer represented that car had certain safety features, but this information was false). Because the Illinois Consumer Fraud Act claim would not survive a motion for summary judgment, the district court did not abuse its discretion when it denied Sound of Music leave to amend to add such a claim.

### III.  CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of 3M is AFFIRMED.

A true Copy:

     Teste:

 

 

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*