**CITGO PETROLEUM CORPORATION,**
Plaintiff,

v.

**RANGER ENTERPRISES, INC., Defendant.**

No. 07–cv–657–bbc.

United States District Court, W.D. Wisconsin.

Nov. 25, 2008.

Shane Brunner, Michael Best & Friedrich LLP, Madison, WI, William Booth, James W. Joseph, Eimer Stahl Klevorn & Solberg LLP, Chicago, IL, for Plaintiff.

Carmen David Caruso, Stahl Cowen Crowley, Chicago, IL, Paul Cranley, Whyte Hirschboeck Dudek S.C., Madison, WI, for Defendant.

## OPINION and ORDER

BARBARA B. CRABB, District Judge.

This case involves a dispute over a franchise agreement between plaintiff CITGO Petroleum Corporation and defendant Ranger Enterprises. On October 7, 1991, plaintiff and defendant entered into a contract for the distribution of gasoline. Plaintiff supplied a specified allotment of gas and defendant was permitted to sell the gas under plaintiff's brand name and trademark. However, the parties' relationship went sour in 2005 and plaintiff brought suit against defendant for breach of contract stemming from defendant's rebranding of its gasoline stations. In response, defendant filed seven affirmative defenses and three counterclaims against plaintiff for prior material breach of contract and violation of the Petroleum Marketing Practices Act, 15 U.S.C. § 2802.

In an order issued on August 27, 2008, I dismissed two of defendant's counterclaims

and three of its affirmative defenses. Defendant's counterclaim for wrongful non-renewal under the Petroleum Marketing Practices Act was dismissed because it was barred by the Act's statute of limitations, and defendant's counterclaim for prior material breach of contract based on brand damage was dismissed for failure to state a claim. Defendant's second and fifth affirmative defenses were dismissed because they were restatements of the counterclaims that were dismissed and defendant's fourth affirmative defense of unclean hands was dismissed as abandoned. 573 F.Supp.2d 1114, 1123–24 (W.D.Wis. 2008).

Now before the court is defendant's motion for leave to amend its counterclaims and reinstate certain affirmative defenses that were dismissed in the August order. Defendant seeks to (1) add new allegations to the counterclaim that was not dismissed; (2) reinstate and amend the dismissed counterclaims; (3) add two new theories of liability on its breach of contract for brand damage counterclaim; and (4) reinstate its second and fifth affirmative defenses.

Because defendant has already filed one amendment to its pleadings pursuant to Rule 15(a)(1), dkt. # 14, it may amend its pleading "only with [plaintiff's] written consent or the court's leave." Fed. R.Civ.P. 15(a)(2). As an initial matter, defendant seeks to add new factual allegations to its counterclaim for breach of contract based on plaintiff's failure to perform its fuel supply commitments. Because this counterclaim was not dismissed and plaintiff does not oppose the amendments, defendant's motion will be granted with respect to this counterclaim.

However, the remaining amendments are opposed by plaintiff and require this court's approval. Although "[t]he court should freely grant leave when justice so requires," leave may be denied for a number of reasons, including the fact that the amendment would be futile because the claims or defenses raised in it would have to be dismissed immediately. *Sound of Music v. Minnesota Mining and Manufacturing Co.*, 477 F.3d 910, 922–23 (7th Cir.2007). That is the situation here. Accordingly, defendant's motion to reinstate and amend its counterclaims for breach of contract based on brand damage and for wrongful non-renewal under the Petroleum Marketing Practices Act and to reinstate its second and fifth affirmative defenses will be denied.

Defendant alleges the following facts in its proposed second amended counterclaim.

## ALLEGATIONS OF FACT

### A. *Plaintiff's Relationship to Hugo Chavez*

Since 1999, the President of Venezuela, Hugo Chavez, was in control of Petróleos de Venezuela, S.A., as a matter of Venezuelan law and politics. Therefore, he was also in control of Petróleos de Venezuela America, a wholly owned subsidiary of Petróleos de Venezuela. Petróleos de Venezuela America is the parent company of plaintiff. Through Petróleos de Venezuela and Petróleos de Venezuela America, Chavez controlled plaintiff either directly or through his loyal appointees.

Directly and through his appointees in Petróleos de Venezuela or Petróleos de Venezuela America, Chavez caused many long time executives of plaintiff to resign. This allowed Chavez or his appointees to install individuals who were loyal to Chavez. These appointees managed the company against plaintiff's best interest. Chavez or his appointees caused plaintiff to move from Tulsa, Oklahoma, to Houston, Texas. Chavez managed plaintiff's business as if it were a department or division

of Petróleos de Venezuela or Petróleos de Venezuela America and not an independent American corporation. This extended to oil supply decisions. Plaintiff was no longer able to pursue an independent business strategy and was captive to the Venezuelan national oil strategy.

In 2005, plaintiff filed documents with the U.S. Securities and Exchange Commission in which it stated that:

We are indirectly owned by [Petróleos de Venezuela] which is wholly-owned by the Bolivarian Republic of Venezuela

[Petróleos de Venezuela], a Venezuelan corporation 100% owned by the Bolivarian Republic of Venezuela, owns, indirectly, 100% of our capital stock. The members of the board of directors of [Petróleos de Venezuela] are appointed by the Venezuelan Ministry of Energy and Mines.... We cannot assure you that [Petróleos de Venezuela] or the Bolivarian Republic of Venezuela will not exercise their indirect control of us in a manner detrimental to your interests ...

No assurances can be given ... that the Venezuelan Government will not make decisions that could impact the commercial affairs or management of [Petróleos de Venezuela] and us. The Venezuelan operations of [Petróleos de Venezuela] and its subsidiaries are subject to close regulation and supervision by various levels and agencies of the Venezuelan Government, and there can be no assurance that the current legal or regulatory framework will not be revised.

Beginning in or about November 2005, Chavez initiated a campaign against the United States of America and its president. On multiple occasions, Chavez made highly publicized statements denouncing the United States of America and its president.

Plaintiff failed to take any steps to distance itself from Chavez's comments. In November 2005, consumers began boycotting plaintiff's products; as a result, defendant's sales suffered significantly.

Plaintiff actively promoted its relationship with the government of Venezuela and Chavez. Plaintiff and Chavez jointly announced a program to distribute gas at deeply discounted prices to American consumers with low income. Plaintiff announced this program in a press release which states:

"With this initiative, [plaintiff] is showing its commitment to the U.S. marketplace and to communities where we have a presence," said [plaintiff's] President and CEO Felix Rodriguez. "As good corporate citizens, we are making an effort to help those in need.

"In this endeavor, [plaintiff] has the full support of our corporate parent, Petroleos de Venezuela, S.A. (PDVSA), the state oil company of the Bolivarian Republic of Venezuela, who is deeply aware of the concerns that have prompted this initiative."

Later in 2005, Chavez appeared at an event in New York City organized and publicized by plaintiff to promote the "oil-for-poor" program. At this event, Chavez publicly stated: "They told me that I should be careful after I called [President George W. Bush] the devil—and I think he is the devil because he might kill me—but I place myself in the hands of God."

On October 2, 2006, plaintiff issued a press release to explain that the termination of a supply agreement between 7–Eleven and plaintiff was not "a reaction by 7–Eleven to the remarks recently made by Venezuelan President Hugo Chavez at the United Nations General Assembly in New York." Instead the press release detailed a number of examples of plaintiff's commitment to American consumers, including:

Plaintiff is incorporated in the United States and is, therefore, a U.S. company,

extremely proud of a heritage that goes back nearly a century.

Plaintiff was purchased by Petróleos de Venezuela, S.A. (PDVSA) in 1990, giving the company access to the largest crude oil reserves in the Western Hemisphere. Venezuela has been a reliable supplier of crude oil and refined products to the U.S. market throughout the years.

Plaintiff's policy includes maintaining and strengthening our relationship with our customers, in order to ensure that we continue to provide quality energy products that benefit the U.S. consumer. This is in alignment with the global energy policy of our parent company.

Defendant continues to suffer from its past affiliation with plaintiff because some consumers believe that defendant is still affiliated with plaintiff and continue to "punish" it for the conduct of Chavez.

### B. *Plaintiff's Failure to Supply Fuel*

On numerous occasions in 2005, plaintiff failed to deliver contractually required fuel purchases to defendant. On October 5, 2005, following hurricane Rita, plaintiff declared force majeure because of damage to its Lake Charles fuel refinery and reduced the supply of fuel it provided to defendant. This caused defendant to seek cover by purchasing more expensive, alternative fuel supplies. Plaintiff never informed defendant of the specific contractual basis for its fuel reductions or how these reductions were determined and it never provided defendant with assurances that fuel supply problems would be solved. Despite plaintiff's representation, damage at the refinery was minor and plaintiff could have obtained sufficient fuel to supply defendant. Instead, it asserted force majeure falsely to mask pre-existing supply problems and avoid its contractual obligations. Because of the decrease in fuel supply, defendant's business nearly failed.

### C. *Defendant's Reliance on Plaintiff's Verbal Assurances*

In or about May 2006, defendant called plaintiff's representative Brad Winczewski to discuss defendant's de-branding. In that conversation, Winczewski implored defendant to " 'leave quietly' and not to make a lot of 'noise' about the non-renewal." In exchange for defendant's agreement to "leave quietly," Winczewski promised defendant that plaintiff would not file any claims against defendant for re-branding. Dan Arnold agreed.

On December 22, 2006, defendant received a letter from plaintiff requesting payment for defendant's re-branding. After receiving this letter, defendant called plaintiff's representative, Brad Winczewski, who verbally confirmed the earlier agreement. Also, he told defendant that the December 2006 letter was a form letter sent for accounting purposes and that it could be disregarded.

### OPINION

### A. *Choice of Law*

Although neither party directly addresses the issue, the parties assume that Oklahoma law governs their contract dispute. In addition, the parties' franchise agreement includes a provision stating that "[t]his agreement shall be governed by the laws of the state of Oklahoma." Plt.'s Cpt., dkt. # 1, exh. A. I will follow the parties' lead and the language of the contract and apply Oklahoma law to their contract. However, defendant's Petroleum Marketing Practices Act claim is a federal cause of action and governed by federal law.

### B. *Brand Damage*

In its original counterclaim defendant asserted a single count of liability for breach of contract by allowing plaintiff's brand name to be damaged. Now defen-

dant seeks to amend its brand damage counterclaim to add new allegations of fact and advance three alternative theories of liability. In addition, defendant seeks to reinstate its second affirmative defense, which is a restatement of this counterclaim.

All three of defendant's proposed counts of liability stem from plaintiff's alleged breach of the implied covenant of "good faith and fair dealing" with respect to the franchise agreement. According to defendant, plaintiff breached this covenant of "good faith" by allowing its brand name to be damaged when it failed to distance itself from Hugo Chavez's alleged campaign of ill-will against America. Because of plaintiff's association with Chavez, American citizens boycotted plaintiff's franchisees, such as defendant, and the franchisees' gas sales dropped. Defendant offers the following three alternate theories of liability: (1) plaintiff is directly liable because of its own inaction in not distancing itself from Chavez; (2) plaintiff is an alter ego for Chavez because he "controls" plaintiff's corporate parents, and therefore, Chavez's speech and actions can be attributed to plaintiff; and (3) because Chavez acted as an agent with apparent authority on plaintiff's behalf, plaintiff is vicariously liable for his actions.

1. *Direct liability on the parties' contract*

 Defendant suggests that plaintiff was under an obligation to protect and promote its brand and that the failure to do so constitutes a breach of "good faith." Although "good faith" is often used in legal parlance, it suffers from a lack of specificity, as this case illustrates. Under Oklahoma law, "[e]very contract contains implied covenants that neither party shall do anything that will destroy or injure another party's right to receive the fruits of the contract." *Hall v. Farmers Insurance Exchange*, 713 P.2d 1027, 1029–1030 (Okla. 1985). In *Hall*, the court explained that

the covenant of good faith is breached when one party "is motivated by bad faith or malice or based on retaliation" or acts in a manner that discharges it of its duties. *Id.* at 1030. Further, as the Seventh Circuit explained,

> [t]he parties to a contract are embarked on a cooperative venture, and a minimum of cooperativeness in the event unforeseen problems arise at the performance stage is required even if not an explicit duty of the contract.... "Good faith" is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.

*Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 595 (7th Cir.1991) (internal citations omitted). In summary, a breach of "good faith" involves a willful act that seeks to take advantage of one contracting party by depriving it of the bargained-for benefit.

 Is it a breach of "good faith" not to actively distance one's self from the comments of a political leader whose nation owns your company's assets and can influence indirect control over your operations? Possibly. Even if it is, however, this is not the sort of situation or risk for which the parties bargained when they entered into the contract.

The bargained-for benefits were the promise to supply a nationally recognized brand and the authorization to sell that brand. Nothing that defendant has alleged about plaintiff's behavior suggest that plaintiff took advantage of defendant by its actions or inactions. Defendant alleges that plaintiff organized and publicized a campaign designed to provide gas to low income Americans at deeply discounted prices. This type of behavior does not

suggest an active or passive effort to damage plaintiff's brand. Quite the opposite, it appears to be promoting and growing plaintiff's brand through good will. According to the representation of plaintiff's president, it was an effort to show "its commitment to the U.S. marketplace and to communities where [plaintiff has] a presence."

Further, defendant's allegations illustrate that in October 2006, plaintiff took active measures to reassert its commitment to American consumers and American business. Although defendant submits this factual allegation as an example of measures plaintiff could have taken earlier to protect its image, it does not evince the sort of active disregard or opportunism indicative of a breach of "good faith." At worst it appears to suggest that plaintiff was slow to respond to "misinformation" regarding its association with Chavez. If defendant's allegations are true, plaintiff's actions harmed plaintiff as much as defendant. This suggests poor management, not an opportunistic manipulation of changed circumstances that would constitute a breach of "good faith." Therefore, defendant's counterclaim for breach of its implied duty of good faith and fair dealing will be dismissed for failure to state a claim. Because I have dismissed this counterclaim, I must also dismiss defendant's second affirmative defense because it is based on this same theory.

## 2. Vicarious liability—alter ego theory

■ According to defendant, plaintiff is also liable for breach of the implied covenant of good faith and fair dealing because plaintiff is completely controlled and dominated by Chavez. Therefore, plaintiff and Chavez are the same legal entity and Chavez's antiAmerican statements should be attributed to plaintiff.

Defendant's argument fails on two grounds. First, the statements made by Chavez do not frustrate the bargained-for benefit of the contract. Although the statements may have alienated some American consumers, the statements alone do not constitute the sort of malicious opportunism implied by a breach of good faith and fair dealing. Therefore, plaintiff has not breached its duty to defendant.

■ Second, even if defendant could state a claim for breach under the facts alleged, defendant's alter ego theory would fail. Oklahoma law does not recognize the application of the alter ego theory to hold a subsidiary liable for the actions of its parent. *Pennmark Resources Co. v. Oklahoma Corp. Com'n*, 6 P.3d 1076, 1081 (Okla.Civ.App.Div.2000) (citing *Frazier v. Bryan Memorial Hospital Authority*, 775 P.2d 281, 288 (Okla.1989)). If defendant cannot use the alter ego theory to hold plaintiff liable for Chavez's actions, its alter ego theory fails. This counterclaim will be dismissed for defendant's failure to state a claim upon which relief may be granted.

## 3. Vicarious liability—agency theory

Defendant further argues that plaintiff is liable for breach of the implied duty of good faith based on the principle of "apparent authority." According to defendant, American consumers believed that plaintiff had "cloaked Chavez with apparent authority to act as [plaintiff's] agent," dft.'s sec. amd. counterclaim, dkt. # 53 at 24, ¶ 67, and began boycotting plaintiff's product because of Chavez. Therefore, plaintiff is liable for the damage Chavez caused to the brand. However, because I have found that neither plaintiff's inaction nor Chavez's statements constitute a breach of plaintiff's contractual duties of good faith and fair dealing, defendant's agency theory fails at the outset.

■ However, even if defendant could state a claim for breach under the facts

alleged, defendant's agency theory fails on the merits as well. To hold plaintiff liable under theory of "apparent authority," defendant must show that plaintiff's conduct led defendant to believe that Chavez was authorized to act on plaintiff's behalf and that defendant was harmed by this reliance. *Sparks Brothers Drilling Co. v. Texas Moran Exploration Co.*, 829 P.2d 951, 954 (Okla.1991). Because defendant alleges that the American public and not defendant relied on Chavez's apparent authority, defendant fails to state a claim for liability under a theory of "apparent authority." Therefore, defendant's counterclaim for breach of the implied duty of goof faith and fair dealing based on the theory of "apparent authority" will be dismissed.

### C. Ranger's Petroleum Marketing Practices Act Claims

In the August 27 order, I dismissed defendant's counterclaim for wrongful non-renewal based on the Petroleum Marketing Practices Act because the one-year statute of limitations to bring a claim under the Act had expired. In its brief opposing dismissal, defendant argued that it should be allowed to present its claim under the theory of equitable estoppel because plaintiff lulled defendant into forfeiting its right by representing that it would not file suit for breach of contract. Plaintiff argued that the doctrine of equitable estoppel was preempted by the Petroleum Marketing Practices Act. I did not decide the preemption question because I found that defendant could not pursue its equitable estoppel theory. Defendant was on notice of plaintiff's intent to pursue claims for breach of contract before the expiration of the statute of limitation.

Now defendant seeks to reassert its fifth affirmative defense and its counterclaim for wrongful non-renewal by adding facts to support its equitable estoppel argument. First, defendant alleges it was "lulled" into

forfeiting its claim for wrongful non-renewal when it reasonably relied on the assurance by plaintiff's representative, Brad Winczewski, that the December 2006 letter was merely a "formality." Second, defendant alleges that it did not learn the extent of plaintiff's "bad faith" for wrongful non-renewal until plaintiff filed its breach of contract claim against defendant on November 20, 2007. In addition, defendant argues that the doctrine of equitable estoppel is not pre-empted by the Petroleum Marketing Practices Act. *Shell Oil Co. v. Wentworth*, 822 F.Supp. 878, 883–884 (D.Conn.1993).

Other federal courts have found that the Act completely pre-empts all state law claims related to non-renewal claims by franchisees, *Jimenez v. BP Oil, Inc.*, 853 F.2d 268, 273 (4th Cir.1988), and, more specifically, any estoppel claims by franchisees. *Camina Services, Inc. v. Shell Oil Co.*, 816 F.Supp. 1533, 1539 (S.D.Fla.1992). However, I need not address the preemption question because defendant has still failed to establish a defense of equitable estoppel for failure to file a claim within the limitations period.

■ To prevail on an equitable estoppel argument, a defendant must demonstrate that the plaintiff took affirmative steps to lull defendant into inaction and that the defendant actually and reasonably relied on the conduct to delay bring suit. *Smith v. Potter*, 445 F.3d 1000, 1010 (7th Cir. 2006). Defendant does not argue that the December 26 letter did not give it notice of plaintiff's possible intent to sue. Instead, defendant contends that it was reasonable to disregard the letter because defendant lacked factual or objective information about plaintiff's intent to sue and could only rely upon the oral representation of Mr. Winczewski, whom defendant had known for fifteen years.

Defendant's argument is unavailing. It has offered only one additional fact to show that it "actually and reasonably relied on" plaintiff's conduct rather than the language of the letter, which communicated a clear intent to pursue plaintiff's legal rights.

 Contrary to defendant's argument that it had no objective or factual information regarding plaintiff's intent, it had a wealth of information regarding plaintiff's behavior at its disposal. Defendant alleges that it nearly went out of business because of plaintiff's repeated failure to supply fuel to defendant. Also, defendant further alleges that plaintiff never informed defendant of the reasons for fuel reductions or how fuel reduction decisions were being made and never gave defendant assurances that plaintiff would fulfill its obligations going forward. According to defendant's allegations, plaintiff had failed repeatedly to uphold its duties and obligations. With this information within its possession, defendant cannot argue that it was reasonable to rely on two conversations with plaintiff's representative rather than the December 26 letter and plaintiff's repeated failure to adhere to its contractual obligations. *Potter*, 445 F.3d at 1011 ("Given the pervasiveness of correct information at Smith's workplace, it is disingenuous of her to argue that she reasonably relied on a single, brief telephone call to lead her astray.").

Defendant's second argument for leave to amend its counterclaim for wrongful nonrenewal fails also. Its factual allegations consist of the following statement:

It was not until November 2007, when [plaintiff] filed suit against Ranger in

> breach of the prior verbal understanding that Ranger had reached with [plaintiff] in July 2006, and reaffirmed with [plaintiff] in December 2006, that Ranger realized the full extent to which [plaintiff] had willfully engaged in dishonest, bad

faith conduct in the non-renewal process.

Defendant proposed no facts about what information in particular it received or why any of the information it received entitles it to equitable tolling of the statute of limitations on its Petroleum Marketing Practices Act claim. Even if I construe defendant's allegation to refer to all the information contained in its seconded amended counterclaim, none of these facts entitle it to a equitable tolling because they do not suggest that plaintiff lulled defendant into refraining from filing. Therefore, defendant's counterclaim for wrongful non-renewal and its fifth affirmative defense based on the same theory will be dismissed for failure to state a claim upon which relief may be granted.

## ORDER

IT IS ORDERED that:

1. Defendant Ranger Enterprise's motion to amend its counterclaim is GRANTED with respect to its motion to add new factual allegations in support of its counterclaim for breach of contract for failure to perform fuel supply commitments; it is DENIED with respect to its motion to amend or reinstate its counterclaims for wrongful non-renewal and breach of contract based on brand damage and its motion to reinstate its second and fifth affirmative defenses.

2. Defendant may have until November 31 in which to file a second amended counterclaim for the limited purpose of adding new factual allegations with respect to its counterclaim for breach of contract for failure to perform fuel supply commitments.