KNOLL, J.,
concurring in part and dissenting in part.
|TI concur with the portion of the majority opinion affirming the trial court’s award of compensatory damages. Plaintiffs unquestionably suffered compensable injuries *325 as a direct result of exposure to noxious chemicals released during the environmental disaster caused by Citgo’s grossly negligent acts.
With all due respect, I strongly dissent from the portion of the majority opinion reversing the trial court’s award of punitive damages under Texas and Oklahoma law. Under the conflicts of laws principles set forth in our Civil Code, punitive damages may be awarded in tort cases where the law of the state of the tortfeasor’s domicile and the law of the state of the tortfeasor’s injurious conduct permit the imposition of punitive damages. The trial court found that Citgo is domiciled in a state which permits punitive damages and that the injurious conduct occurred there. The trial court made no error of fact or law, and I would affirm.
The evidence fully confirms the factual findings of the trial court. Defendant Cit-go is a multinational corporation currently headquartered in Houston and domiciled in Texas. Citgo owns and operates a large oil refinery in Calcasieu Parish, Louisiana. In 1994, Citgo began construction of two on-site storage tanks designed to hold wastewater, slop oil, and other byproducts of the petroleum | ¡^refining process. At the time, Citgo was headquartered in Tulsa, Oklahoma. There was an internal dispute among Citgo employees over the number of 10 million gallon storage tanks necessary to safely contain the refinery’s waste products. The original plans called for three tanks. However, in an attempt to keep down costs, Citgo headquarters made the budgetary decision to build the refinery with only two tanks. As stated in a Citgo internal memorandum, “[bjecause of the high capital costs involved, the design of the WWTP [wastewater treatment plant] was intentionally limited in capacity.” [1] As early as 1995, Citgo employees and outside contractors circulated memo-randa warning Citgo headquarters of the storage tanks’ insufficient capacity: “there have been several near miss events in terms of exceeding the capacity of the stormwater tanks” and the “potential for an overflow situation well short of the 25 year event is high.” A 1997 internal memorandum noted there was “little or no extra room to handle major refinery upsets or a heavy rainfall event.” Nonetheless, by not building the third wastewater tank, Citgo saved approximately $12 million.
In 2004, Citgo moved its headquarters to Houston. In 2005, Citgo management finally approved construction of a third tank. However, Citgo headquarters required the refinery to hire a Venezuelan[2] engineering firm for budgetary reasons, and the construction was delayed. On June 19, 2006, after heavy rains, the storage tanks overflowed. At least 4 million gallons of toxic slop oil and 17 million gallons of wastewater discharged into the Calcasieu River, temporarily shutting down the Calcasieu Ship Channel and wreaking environmental havoc. Cleanup took weeks and cost (in Citgo’s estimate) $65 |smillion. In September 2008, Citgo pleaded guilty in federal court to violations of the Clean Water Act and was fined $13 million in criminal penalties, the largest such fine in Louisiana history, and an additional' $9 million in civil penalties.
*326 Plaintiffs, who worked slightly downriver from the Citgo refinery, were exposed to the slop oil and other noxious chemicals and complained of headaches, sinus problems, nausea, and eye irritation. Although some plaintiffs complained of only short term irritation, others suffered long-term health effects as a result of the exposure. The toxins lingered near plaintiffs’ work area for approximately two months after the spill.
Plaintiffs sued, and Citgo stipulated to fault. The only issues presented for trial were causation, quantum of compensatory damages, and punitive damages. I agree with the majority’s affirmation of the lower courts’ rulings on causation and compensatory damages. However, the majority clearly errs in its legal analysis of the choice of law issue, thus compelling my dissent.
Book IV of the Civil Code sets forth a comprehensive statutory framework for resolving choice of law issues in cases involving contacts with more than one state or foreign country. The guiding principle of Book IV is determining which state’s policies would be most impaired if its law were not applied to the dispute:
Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
■That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
La. Civ.Code art. 3515.
[4La. Civ.Code arts. 3542 and 3546 set forth more specific rules dealing with del-ictual actions in general and punitive damages in particular:
Except as otherwise provided in this Title, an issue of delictual or quasi-delic-tual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the pai’ties, and the state in which the relationship, if any, between the parties was centered; and (2) the policies referred to in Article 3515, as well as the policies of deterring wrongful conduct and of repairing the consequences of injurious acts.
La. Civ.Code art. 3542.
Punitive damages may not be awarded by a court of this state unless authorized:
(1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or
(2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was domiciled.
La. Civ.Code art. 3546.
In short, punitive damages may be awarded under article 3546 if such dam *327 ages are authorized under the law of the state or states with two or more of the following contacts: (a) place of the injurious conduct; (b) place of the resulting injury; and (c) place of the defendant’s domicile. Patrick J. Borchers, Punitive Damages, Forum Shopping, and the Conflict of Laws, 70 La. L.Rev. 529, 546-47 (2010); Wooley v. Lucksinger, 09-571 (La.4/1/11), 61 So.3d 507, 567. It is undisputed that the state of the plaintiffs’ injury is Louisiana. Therefore, punitive | .^damages may be awarded if and only if both the state of Citgo’s domicile and the state of the “injurious conduct” authorize punitive damages.
Notably, the codal choice of law provisions do not create a legal presumption that Louisiana law should be applied simply because the suit was filed in Louisiana. The court is not called on to apply the law it prefers, or the law it believes is best suited to resolve the dispute. Instead, the Legislature specifically drafted a neutral set of principles directing courts to consider the relative interests of each jurisdiction and the policies at issue in the case.
In any case involving a potential choice of law issue, the court’s first task is to determine which jurisdictions have meaningful contacts to the dispute. Here, there are three jurisdictions which may have an interest in having their laws applied to this dispute — Louisiana, Texas, and Oklahoma. Next, a court must determine whether there is any meaningful difference between the substantive laws of the three jurisdictions. If the governing law of each jurisdiction is identical, or so similar that the same result would be reached under either law, there is a “false conflict” and, thus, no need to determine which state’s law applies.[3]
Here, application of Louisiana law clearly leads to a different result than application of either Texas or Oklahoma law. However, as between Texas and Oklahoma, there appears to be no conflict. Punitive damages would be proper under either state’s law,[4] and the parties do not urge that the result would be [(¡different depending on which state’s law is applied. Therefore, for the purposes of this analysis, any distinction between Texas law and *328 policy and Oklahoma law and policy is a “false conflict.”

A. Citgo’s Place of Domicile

La. Civ.Code art. 3518 provides that, for the purposes of a choice of law determination, a “juridical person may be treated as a domiciliary of either the state of its formation or the state of its principal place of business, whichever is most pertinent to the particular issue.” Citgo is incorporated in Delaware, but has minimal contacts in that state. For the purposes of article 3518, Citgo’s domicile is the state of its headquarters and principal place of business. Prior to 2004, Citgo maintained its headquarters and principal place of business in Oklahoma, and was domiciled there. In 2004, Citgo moved its headquarters to Houston, and it is |7currently domiciled in Texas. Therefore, for the purposes of article 3518, Citgo is a domiciliary of Texas and Oklahoma, which supports an award of punitive damages.
However, La. Civ.Code art. 3548 sets forth a possible exception to the domicile rules under article 3518. In delictual cases only, a court may treat a non-Louisiana domiciliary as if it were a Louisiana domiciliary under limited circumstances:
For the purposes of this Title, and provided it is appropriate under the principles of Article 3542, a juridical person that is domiciled outside this state, but which transacts business in this state and incurs a delictual or quasi-delictual obligation arising from activity within this state, shall be treated as a domiciliary of this state.
We must determine whether treating Citgo as a Louisiana domiciliary is “appropriate under the principles of Article 3542.” As noted above, the primary question presented by article 3542 is which state’s policies would be “most seriously impaired if its law were not applied to the issue.”[5]
There are two principal guiding policies behind punitive damages awards: deterrence and punishment. Notably, both of these policies are directed towards the tortfeasor, not the victim. The “domicile of the victim is not a pertinent factor” in determining choice of law in a punitive damages case. La. Civ.Code art. 3546, | scmt. (b). The victim is made whole by the award of compensatory damages; punitive damages are intended to go beyond mere compensation and deter wrongful behavior by providing additional punishment to the tortfeasor.[6]
The Texas Supreme Court explained the primary public policies served by punitive *329 damages awards: “In addition to punishment, punitive damages are allowed to deter the same or similar future conduct ... punishment and deterrence [are] co-purposes of punitive damages awards.”[7] Oklahoma’s public policy is much the same: “the essence of an exemplary damage award is punitive in nature and is proper where the defendant has maliciously or wantonly and wilfully invaded the rights of the plaintiff. Its purpose is to restrain the defendant and to deter others from the commission of similar wrongs.”[8] In short, both Texas and Oklahoma have a strong interest in insuring that their corporate citizens are punished for gross environmental negligence so as to deter them from future wrongful actions. This policy is especially strong in the oil spill context, as both Texas and Oklahoma are, like Louisiana, heavily involved in energy-related industries.
In contrast, Louisiana’s policy in disallowing punitive damages is to protect its domiciliaries from excessive legal liability. As Citgo is not (and never has been) a Louisiana domiciliary, this policy is not impacted in this case. Louisiana’s 19punitive damages law is intended to protect Louisiana tortfeasors, but it has no interest in protecting Texas tortfeasors.
We should also take into account Citgo’s interests in operating under the laws of the state where it chooses to make its principal place of business. By maintaining its headquarters in Oklahoma, then in Texas, Citgo implicitly agreed to be bound by the laws of those states. Indeed, Citgo apparently has a strong interest in having the laws of Oklahoma and Texas applied to suits in which it is a party, as its standard Franchise Agreement contains a choice of law provision mandating Oklahoma or Texas law, even when it is contracting with out of state franchisees.[9]
Stated simply, Texas and Oklahoma have strong interests in applying their punitive damages laws to regulate, punish, and deter wrongful conduct committed by corporations headquartered in those states. Louisiana has no countervailing interest in applying its law to actions taken by a corporation not headquartered in this state.[10] Under the balancing test set forth *330 in article 3542, Texas and Oklahoma | Tnare the states whose policies would be most seriously impaired if Citgo were not treated as a domiciliary of those states. It would therefore be improper to treat Citgo as a Louisiana domiciliary under article 3548 for the purposes of the choice of law analysis.

B. Where the Injurious Conduct Occurred

The next question is the state of the injurious conduct; that is, the state where Citgo committed the wrongful and negligent acts which caused the oil spill. The trial court found the bulk of the injurious conduct took place in Texas and Oklahoma, at Citgo’s headquarters. The majority opinion, giving no deference to the trial court’s findings of fact, finds the only injurious conduct in this case was committed by the relatively low-level employees located in Louisiana who negligently failed to conduct routine maintenance of the storage tanks and dikes. I would find, as did the trial court, that Citgo’s responsibility for this environmental disaster began further up in the corporate hierarchy, with decisions made by executives in Oklahoma and Texas. Therefore, for the purposes of article 3546, the injurious conduct took place in Oklahoma and/or Texas.
This Court has not had occasion to analyze the proper standard for determining the place of “injurious conduct” under article 3546 where, as here, there are multiple negligent acts which, together, caused the plaintiffs injury. The closest case on point is our recent decision of Wooley v. Lucksinger, 09-571 (La.4/1/11), 61 So.3d 507,[11] which also involved wrongful actions by corporate | n executives located in Texas. In Wooley this Court found the “majority” of the injurious conduct took place in Texas and therefore applied Texas punitive damages law:
This article [3546] points squarely toward the applicability of Texas law: Texas was the state where the majority of the tortious conduct occurred and where most of the damage was inflicted. Here, due to the intertwined nature of the tortious acts alleged, the operative facts relating to Health Net’s conduct are common to all of the claims asserted by the three Receivers. We find no error in the district court’s determination that all of the victims of the same scheme should share the same remedy, no matter where they reside. Moreover, to hold Health Net responsible for punitive damages does not somehow deny the insurance regulatory agencies in Louisiana and Oklahoma the authority to regulate insurance in their states.
*331 Id. at 567
Wooley defines the state of the injurious conduct as the state where a “majority of the tortious conduct occurred.” The majority essentially follows the legal standard set forth in Wooley, finding out-of-state “management or corporate level decisions must outweigh tortious activity which' occurs locally in order for the location of the corporate or management decision to be considered the locale of the injurious' conduct.” (Op. at 18). While I believe this is the appropriate standard, the majority clearly errs in applying that standard to the facts of this case as found by the trial court and established in the record.
The ultimate question is whether the trial court committed manifest error in finding, as a matter of fact, that the majority of the injurious conduct took place out of state. Under the manifest error standard, we must indulge every presumption in favor of the factual findings of the trial court and cannot substitute our own view of [ 12the evidence for that of the trial court.[12] The manifest error standard is especially important where, as here, the district court presided over a lengthy and complex trial and heard testimony from numerous fact and expert witnesses. The “trial judge is in the best position to review the factual circumstances and render an informed judgment as he is intimately involved with the case, the litigants, and the attorneys on a daily basis,” [13] while this Court is constrained to reviewing a cold record. On review, the record evidence fully supports the factual determinations of the trial court, and there are no grounds for a finding of manifest error.
There were two fundamental causes of the oil spill: first, the wastewater tanks were underbuilt, leading to a lack of adequate storage capacity; second, the tanks and dikes were not adequately maintained. From the very beginning, Citgo management made a conscious decision to intentionally underbuild the wastewater treatment units at the Lake Charles refinery. The original construction plans, drafted in 1992, called for three tanks, each holding 10 million gallons. However, Citgo management, then located in Oklahoma, issued cost reduction directives and budgetary constraints which led to cutting, among other things, the third planned tank. This decision was not made for engineering purposes; it was made to save money.
Notably, the Lake Charles refinery requested additional funds for building a third tank as early as 1996, and a third party engineering firm echoed this recommendation in 2002. In the meantime, the storage tanks proved inadequate on | ^several occasions, as oily wastewater leaked into the surge pond on at least six occasions, and the refinery had accumulated more than 950 days’ worth of permit violations since 1994. However, Citgo management deferred budgeting money for construction until May 2004, and the third tank was not completed by the time of the spill. Construction of the third tank was delayed by Citgo’s attempt to use a Venezuelan engineering firm in yet another cost-cutting measure. Because of the ongoing construction at the time of the *332 spill, portions of the concrete dike floor had been removed, which allowed the oil and wastewater to escape. If construction had been completed sooner, there would have been no such gaps for the oil to spill through. These facts establish a pattern of Citgo management consistently deciding to place budgetary concerns ahead of engineering and environmental necessities. While some of these decisions were made with the input of employees at the Lake Charles refinery, the ultimate responsibility for refinery construction and operation rests with the corporate management. The final decisions on budgetary matters were unquestionably made in Oklahoma and Texas.
The majority opinion downplays the significance of these decisions by Citgo headquarters; indeed, it barely even acknowledges their existence. Incredibly, the majority finds Citgo’s failure to construct a third tank is'irrelevant because, in the majority’s opinion, a third tank would not have been sufficient to completely prevent the spill. Citgo does not even raise that argument in its briefs before this Court, and the majority does not cite to any record evidence or testimony to support this finding. In any event, even if the majority is correct, that does not excuse Citgo’s underbuilding of the refinery. Citgo has a duty to build however many tanks would be necessary to store the slop oil and wastewater created by the refinery. If three tanks would not have been enough, Citgo had a duty to build four. Following the 2006 spill, ENSR International Corp., an environmental regulatory consulting company hired by Citgo, recommended construction of a fourth tank to 114ensure no further spills would occur. Yet even after the catastrophic 2006 oil spill, Citgo obstinately refused to build the fourth tank, solely because it wished to keep down costs. As a result, the federal district court was forced to issue an injunction ordering Citgo to construct a fourth tank in order to ensure compliance with the Clean Water Act.[14]
It is an undisputed fact that this spill took place because the Citgo wastewater treatment plant was knowingly and purposefully built without sufficient capacity to safely retain the amount of slop oil and wastewater generated by the refinery. Citgo management was aware of this shortcoming, yet repeatedly refused to budget the necessary funds to build sufficient waste storage capacity. These budgetary decisions were both a cause-in-fact and the legal cause of the eventual environmental disaster, and this alone is sufficient to justify the trial court’s finding that the injurious conduct took place at Citgo headquarters, where these budgetary decisions were made.
The majority places great weight on Citgo’s failure to adequately maintain the tanks and dikes, including the failure to run the oil “skimmers” designed to minimize the level of oil in the tanks. However, this is at most a secondary consideration. While the lack of routine maintenance may have aggravated the effects of the spill, the spill was primarily caused by the lack of adequate waste-water storage capacity. Citgo engineers and consultants warned management of the inadequate capacity as early as 1995 and repeatedly requested funds for building additional tanks. The engineers obviously believed that, even if the two tank system were properly maintained and the oil skimmers were run, two tanks would simply not provide sufficient storage capacity. Notably, the federal court issued an injunction requiring Cit-go both to build a fourth tank and to *333 adequately 11smaintain those tanks— maintenance alone is not sufficient to prevent future spills. The wastewater and slop oil storage tanks overflowed because there were not enough tanks to contain the amount of byproducts generated by the Lake Charles refinery. There were not enough storage tanks because Citgo headquarters refused to budget enough money to build those tanks. If Citgo had budgeted for sufficient storage capacity to contain the wastewater and slop oil, the tanks would not have overflowed and the on-site maintenance issues would be irrelevant. The failure to build those tanks is thus the primary and superseding cause of the spill.
Even assuming the negligence in maintaining the tanks is a relevant consideration, the majority errs in finding the negligent failure to properly maintain the facility took place solely in Louisiana. The implied finding is that Citgo, as a corporation, is somehow not responsible for the actions of its employees in Louisiana. This is puzzling, to say the least. It is a fundamental principle of corporate law that a corporation acts only through its officers, employees, and other agents or mandataries.[15] It is ultimately the responsibility of management to ensure that proper safety and environmental protocols are followed at each and every corporate facility. Citgo’s own corporate governance documents make this principle clear: “Executive Management of the Corporation establishes policies, approves standards and goals for performance, and reviews HS & E [Health, Safety, and Environmental] compliance for all facili-ties_ the Corporate HS & E Department will conduct comprehensive reviews and assessment of facility compliance through verification of field practices to established procedures.” Citgo executives draft the company’s safety and environmental policies, and Citgo’s | ^headquarters bears the responsibility of ensuring these policies are followed by employees in the field.[16]
While the severity of the spill was exacerbated by the day-to-day negligence of the Louisiana employees, the culpability for that negligence rests equally on the Citgo corporate officers who failed to conduct the safety and environmental inspections necessary to ensure the Lake Charles refinery was following the appropriate protocols. The lack of routine maintenance was apparently an ongoing problem, meaning Citgo executives and supervisors had ample opportunity to remedy the problems at the refinery. They did not do so. From a policy perspective, this corporate negligence is far more troublesome than the negligence of the individual employees because its scope is wider. Cit-go’s failure to enforce its own Health, Safety, and Environmental regulations at the corporate level potentially affects not just the Lake Charles refinery, but every Citgo facility in the country. Both Texas and Oklahoma have, a strong public policy in favor of deterring this kind of lax corporate oversight, if necessary, by imposition *334 of punitive damages.[17]
The Texas Supreme Court discussed corporate liability for punitive damages at length in Mobil Oil Corp. v. Ellender, 968 S.W.2d 917 (Tex.1998):
Because a corporation can “act only through agents of some character,” this Court has developed tests for distinguishing between acts that are solely attributable to agents or employees and acts that are directly attributable to the Incorporation. A corporation is liable for punitive damages if it authorizes or ratifies an agent’s gross negligence or if it is grossly negligent in hiring an unfit agent.
A corporation is also liable if it commits gross negligence through the actions or inactions of a vice principal. “Vice principal” encompasses: (a) corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom the master has confided the management of the whole or a department or a division of the business.
In determining whether acts are directly attributable to the corporation, the reviewing court does not simply judge individual elements or facts. Instead, the court should review all the surrounding facts and circumstances to determine whether the corporation itself is grossly negligent. Whether the corporation’s acts can be attributed to the corporation itself, and thereby constitute corporate gross negligence, is determined by reasonable inferences the fact-finder can draw from what the corporation did or failed to do and the facts existing at relevant times that contributed to a plaintiffs alleged damages.
Id at 921-22 (citations omitted).
The actions of the Citgo corporation, through its officers and other “vice principals,” were grossly negligent under Texas law.[18] In Ellender, defendant Mobil Oil was taxed with punitive damages because its corporate management failed to establish an adequate corporate safety policy to protect its employees from known dangers. Id. at 924. Citgo management in Texas and Oklahoma likewise failed to establish or enforce adequate corporate policies to prevent environmental and public health damages resulting from its refinery operations. The law is clear that an employer’s negligent supervision of its employees and | incorporate operations is a separate and distinct tortious act.[19] Citgo headquarters committed gross negligence in failing to establish and enforce adequate safety and environmental protection at its refineries. This is an independent “injurious conduct” *335 which occurred solely in Texas and Oklahoma.
I do not understand how, given the evidence in the record, the majority can conclude that the trial court committed manifest error in finding that the majority of the injurious conduct took place in Texas and Oklahoma. I fear this opinion tilts the board in favor of applying Louisiana law to out-of-state companies who commit wrongful acts in their home states, as this case evinces. This interferes with the rights of our sister states to apply their own laws to the actions of companies headquartered in those states. While Louisiana does not have a strong policy of deterring environmental misconduct through punitive damages, Texas and Oklahoma do. Those states are just as involved in mineral exploration and refining as Louisiana, and they have authorized strong civil penalties against the kind of conduct which occurred in this case. We have a duty to respect the policy decisions made by the legislatures of our sister states. Instead, the majority effectively overwrites the laws of Oklahoma and Texas in favor of Louisiana law.
It appears the majority reaches its conclusion by applying Louisiana’s public policy against imposition of punitive damages in cases under Louisiana law. However, this public policy is limited to cases arising out of Louisiana substantive law; Louisiana has no public policy against an award of punitive damages in cases involving Texas substantive law against a Texas domiciliary. In such cases, we are required to follow the law and public policies set forth by the Texas legislature. |inThe majority commits a fundamental error of law by using Louisiana’s substantive public policy to decide a choice of law issue.
The record establishes that the primary cause of the spill was management and budgeting decisions made by Citgo headquarters in Texas and Oklahoma. These decisions caused the refinery wastewater treatment plant to be woefully underbuilt. Given the admitted lack of capacity of the storage tanks, and the numerous prior incidents in which the tanks overflowed, Citgo management clearly knew of the potential for disaster yet did nothing. The failure to properly maintain the storage tanks and operate the oil skimmers was a secondary cause of the spill, and a portion of that negligence took place in Louisiana. However, the ultimate responsibility for the refinery’s safety and environmental compliance rests with Citgo headquarters. Given these factors, I agree with the trial court’s determination that the decisions made at corporate headquarters outweighed any decisions made in Louisiana, and the “injurious conduct” ultimately took place in Oklahoma and Texas. As both the state of Citgo’s domicile and the state of the injurious conduct permit punitive damages, I would affirm the trial court’s judgment in accord with La. Civ. Code art. 3546.
Conclusion
I am very disappointed that my esteemed colleagues have overruled the factual findings in this case contrary to the manifest error doctrine. This decision in turn allows defendants to haphazardly, dangerously pollute the state of Louisiana. It is an inescapable conclusion that Citgo’s tortious conduct in Oklahoma and Texas was a direct cause of the oil spill which led to widespread pollution and public health harms in our state. Punitive damages, which would both punish and deter this conduct, are authorized by the laws of the state of the defendant’s domicile and the state where the injurious conduct occurred. Under La. Civ.Code art. 3546, the trial court did not err in awarding punitive damages against defendant l2nCitgo. I *336 therefore respectfully dissent and would affirm the judgment of the lower courts.
GUIDRY, Justice, concurs in the result and assigns reasons.
hi respectfully concur with the majority opinion on the issue of punitive damages. This court granted writs in the instant case primarily to address the choice of law to be applied for the award of damages under the facts.
The proceedings arise out of an oil spill at a Louisiana refinery owned by the defendant, CITGO Petroleum Corporation (CITGO). The accident resulted from the overflow of storage tanks following a heavy rain storm. Plaintiffs urge corporate management’s decisions concerning the refinery’s storage tank capacity was the principal cause of the toxic spill. CIT-GO’s administrative offices were headquartered in Oklahoma during the initial construction of the refinery’s storage tanks. The corporation subsequently moved its headquarters to Houston, Texas, its location at the time of the spill.
Generally, exemplary or punitive damages are not allowable under Louisiana law. Bellard v. American Cent. Ins. Co., 2007-1335, p. 18 (La.4/18/08), 980 So.2d 654, 667 (citing Gagnard v. Baldridge, 612 So.2d 732, 736 (La.1993)). There are limited statutory exceptions to the general rule. Id. See, e.g., La. C.C. arts. 2315.3, 2315.4, and 2315.7, and La. R.S. 46:440.3(0(2). However, it is undisputed that none |2of the provisions allowing the award of punitive damages under Louisiana law are applicable under the facts.[1] Instead, the plaintiffs seek relief in the Louisiana courts through the application of Texas or Oklahoma law, both of which permit the award of punitive damages.[2]
The court of appeal affirmed the trial court’s use of La. C.C. art. 3546 to award punitive damages based on Texas law. The appellate court concluded that Texas was, at the time of the spill, the location of CITGO’s domicile and corporate headquarters and, as such, presumably the location where budget and management decisions were made concerning the construction of facilities and operations at the Louisiana refinery. CITGO assigns as error the court of appeal’s failure to apply Louisiana law, arguing it should apply since CITGO is a Louisiana domiciliary under La. C.C. art. 3542, and it is the state where the injurious conduct took place and the injuries were sustained.
In addressing the question of choice of law, I believe that de novo review is the appropriate standard, not manifest error. Wooley v. Lucksinger, 2009-0571, p. 62-63 (La.4/1/11), 61 So.3d 507, 562-563; Mihalopoulos v. Westwind Africa Line, Ltd., 511 So.2d 771, 775-76 (La.App. 5th Cir.1987) (“The law is well settled that a determination of choice of law by the trial court is reviewed by the appellate courts ‘de novo[,]’” citing Diaz v. Humboldt, 722 F.2d 1216 (5th Cir.1984).)
“La. C.C. art. 3546 provides the standard for determining when the remedy of punitive damages may be imposed.” Wooley, 2009-0571, p. 69, 61 So.3d at 567. The | sprovision states in full:
Punitive damages may not be awarded by a court of this state unless authorized:
*337 (1) By the law of the state where the injurious conduct occurred and by either the law of the state where the resulting injury occurred or the law of the place where the person whose conduct caused the injury was domiciled; or
(2) By the law of the state in which the injury occurred and by the law of the state where the person whose conduct caused the injury was domiciled.
The parties do not dispute that Louisiana is the “state where the resulting injury occurred.” Therefore, another state’s laws regarding punitive damages can be applicable pursuant to La. C.C. art. 3546 if the injurious conduct occurred in that state, and not in Louisiana, and if either one or both of the remaining provisions of Paragraph (1) are established. Stated differently, if the injurious conduct did occur in Louisiana, the application of another state’s punitive damages laws would not be allowed, and the analysis should end at that point.[3]
Utilizing de novo review, I find the tor-tious conduct that took place at CITGO’s Louisiana refinery was the “principal cause of injury”[4] of the plaintiffs’ toxic exposure and that Louisiana was the state where the injurious conduct ■ occurred. Based on my review of the record, this conduct far outweighed and offset any injury that may have been caused by the administrative actions or inaction of CIT-GO’s Texas and Oklahoma management. CITGO correctly points out that the plaintiffs’ own engineering expert testified that the oil spill resulted principally from several contributing factors related to the Louisiana refinery, namely, inoperable oil skimmers |4that allowed the accumulation of oil in the tanks; the failure to maintain tank water levels; and the installation of an unsealed junction box and an earthen containment dike with the propensity to breach. It is clear that the negligent actions of the refinery’s employees more directly precipitated the spill than any budget or management decisions made at CITGO’s corporate headquarters regarding tank capacity.
Additionally, I find no merit in the plaintiffs’ assertions that CITGO’s corporate officers must be held accountable for the negligent acts of its Louisiana employees relative to the day to day operations of the refinery. The plaintiffs have provided no compelling evidence that corporate management was aware of the tortious conduct at the Louisiana refinery and failed to remedy the problem. Nor is there any controlling evidence that corporate officers neglected to provide adequate supervision over operations at the refinery. Under these facts, it would be implausible to extend the theory of vicarious liability or respondeat superior simply for the benefit of allowing the plaintiffs to recover exemplary damages through the application of another jurisdiction’s laws. It is a fundamental tenet of Louisiana law that punitive or other penalty damages are not allowable unless expressly authorized by statute. Ricard v. State, 390 So.2d 882, 884 (La.1980). Our Legislature has taken concerted effort to bar recovery for punitive damages in toxic tort cases, as evi *338 denced by the repeal of former La. C.C. art. 2815.3. See supra note 1. To allow recovery under these facts, would infer a jurisprudential rule that corporations headquartered out-of-state can be held vicariously liable through the application of another forum’s laws for its Louisiana employees’ tortious acts absent evidence of management’s participation, consent or control.
For the above reasons, I concur in the majority’s result.

. The same Citgo memorandum referred to the wastewater treatment plant as a "non-return project” that “had no monetary payback.” There was a concern that "money spent on non-return projects reduces the amount of money that could be spent elsewhere on higher return.”

. Citgo is wholly owned by Petróleos de Venezuela, S.A., the state-owned oil company of the Bolivarian Republic of Venezuela.

. See Eugene F. Scoles, et al., Conflict of Laws 28, n.16 (4th ed.2004)("[f]alse conflicts also include cases in which the laws of the involved states are identical, or different, but produce identical results”); Zimko v. American Cyanamid, 03-658 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, 481, writ denied, 05-2102 (La.3/17/06), 925 So.2d 538.

. Tex.Code Civ. Prac. & Rem. § 41.003(a) provides:
[E]xemplary damages may be awarded only if the claimant proves by clear and convincing evidence that the harm with respect to which the claimant seeks recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross negligence.
Okla. Stat. tit. 23, § 9.1 states, in relevant part:
In an action for the breach of an obligation not arising from contract, the jury, in addition to actual damages, may, subject to the provisions and limitations in subsections B, C and D of this section, award punitive damages for the sake of example and by way of punishing the defendant based upon the following factors:
1. The seriousness of the hazard to the public arising from the defendant’s misconduct;
2. The profitability of the misconduct to the defendant;
3. The duration of the misconduct and any concealment of it;
4. The degree of the defendant's awareness of the hazard and of its excessiveness;
5. The attitude and conduct of the defendant upon discovery of the misconduct or hazard;
6. In the case of a defendant which is a corporation or other entity, the number and level of employees involved in causing or concealing the misconduct; and
7. The financial condition of the defendant.

. The majority criticizes this analysis because it does not discuss every possible policy listed in article 3542. The statute expressly requires the court to consider only the "relevant policies of the involved state,” and my analysis (unlike that of the majority) only focuses on the factors which are directly related to the punitive damages claim at the heart of this case. The revision comments to article 3542 make clear that the list of policies and contacts is merely an "illustrative list” which is “neither exhaustive nor hierarchical, and is intended to discourage a mechanistic counting of contacts as a method of selecting the applicable law.” La. Civ.Code art. 3542, cmt. (a).
The majority errs by taking into account manifestly irrelevant factors such as the domicile of the victims. This is a punitive damages dispute, and this Court should concern itself only with those policies directly related to punitive damages — punishment of wrongdoers, and the deterrence of future wrongful acts.

. La. Civ.Code art. 3546, cmt. (b), "Punitive damages are not intended for the protection of the individual victim who, ex hypothesi, has been compensated for his loss through ordinary damages. Instead, punitive damages are for the most part designed to 'punish' the individual tortfeasor, to deter him and other potential tortfeasors in the future.”

. Lunsford v. Morris, 746 S.W.2d 471, 472 (Tex.1988)(intemal citations omitted).

. Timmons v. Royal Globe Ins. Co., 653 P.2d 907, 919 (Okla.1982); Estrada v. Port City Properties, Inc., 258 P.3d 495, 502 n. 21 (Okla.2011)(‘‘Exemplary damages are a tool to deter the wrongdoer and are for society's benefit, not the litigating party's.”)

. See CITGO Petroleum Corp. v. Home Service Oil Corp., 2009 WL 4348391, at *6-7, 2009 U.S. Dist. LEXIS 110764, at *19 (N.D.Okla.2009); Citgo Petroleum Corp. v. Ranger Enterprises, 590 F.Supp.2d 1064, 1068 (W.D.Wisc.2008); Citgo Petroleum Corp. v. Bray Terminals, Inc., 2005 WL 3681769, at *2 n. 1, 2005 U.S. Dist. LEXIS 39766, at *6 n. 1 (N.D.Okla.2005); Pantry, Inc. v. Citgo Petroleum Corp., 2009 NCBC 1, ¶46, 2009 WL 369057 (N.C.Super.Ct.2009); see also page 22 of the Citgo “Managed Service Agreement,” available at https://www.citgo.com/WebOther/ CITGOLightOilsCustomerServiceReference ManuaI/files/05cNewPaymentCardPrograms. pdf (requiring application of Texas law).

.Professor Symeonides describes this situation as a "false conflict,” as only the state of the defendant's domicile has a true interest in applying its policies: "The first state has an interest in applying its punitive-damages law in order to punish the tortfeasor who engaged in egregious conduct in that state, and to deter others similarly situated. In contrast, the state of injury does not have an interest in applying its non-punitive-damages law because that law is designed to protect tortfea-sors who are either domiciled in, or act in, that state, neither of which is the case here.” Symeon C. Symeonides, Choice of Law in Cross-Border Torts: Why Plaintiffs Win and Should, 61 Hastings LJ. 337, 357 (2009).
See also Fanselow v. Rice, 213 F.Supp.2d 1077, 1085-86 (D.Neb.2002) ("[D]eterring fu *330 ture wrongdoing by the defendants would most benefit their respective states of residence, while protecting two non-resident defendants against excessive financial liability provides little benefit to Nebraska or its citizens.”)

. The majority also cites In re Train Derailment, 2004 WL 169805 (E.D.La.2004), an unpublished federal district court decision involving a factual finding that the "injurious conduct” leading to a train accident in Louisiana was not caused by decisions made at corporate headquarters in Mississippi, and Security Title Guarantee Corp. of Baltimore v. United General Title Ins. Co., 91 F.3d 137 (5th Cir.1996)(unpublished), in which the Fifth Circuit expressly declined to address the question of where the "injurious conduct” occurred, as the other two factors (domicile of the defendant and state of injury) mandated application of Louisiana law, rendering the place of injurious conduct irrelevant. These cases are unpublished and carry little or no jurisprudential weight. The Fifth Circuit's own rules state "Unpublished opinions issued on or after January 1, 1996, are not precedent, except under the doctrine of res judica-ta, collateral estoppel or law of the case." U.S. 5th Cir. R. 47.5.4.

. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1114 (La.1990); Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Justice Guidry's concurrence suggests a de novo review is appropriate. While I agree that the trial court's legal conclusion on a choice of law issue is subject to de novo review, the trial court's findings of fact are entitled to a good deal of deference under the manifest error standard.

. Thomas v. Capital Security Services, Inc., 836 F.2d 866, 873 (5th Cir.1988); State v. Payne, 01-3196 (La.12/4/02), 833 So.2d 927, 933; Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, 609-10.

. See Judgment in U.S. v. Citgo, case no. 08-cv-0893 (W.D.La.9/29/11) at p. 12.

. Doe v. Parauka, 97-2434 (La.7/8/98), 714 So.2d 701, 705 n. 5; Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d 387, 391 (Tex.1997); Porter v. Norton-Stuart Pontiac-Cadillac of Enid, 405 P.2d 109, 114 (Okla.1965).

. This duty is imposed by federal law, including the Clean Water Act, which Citgo pleaded guilty to violating. See, e.g., U.S. v. Iverson, 162 F.3d 1015, 1022-24 (9th Cir.1998), which discusses the "responsible corporate officer” doctrine. Under this doctrine, a corporate officer is liable for environmental violations if he “has authority to exercise control over the corporation's activity that is causing the discharges,” whether or not he actually exercised that authority. Id. at 1025.

. This public policy is doubly strong because Texas is both the site of Citgo’s headquarters and the site of one of its three U.S. refineries, located in Corpus Christi. Texas has a vested interest in preventing negligent acts by its own corporate citizens which could lead to environmental disaster within its borders.

. Oklahoma jurisprudence also holds that punitive or exemplary damages may be awarded against the principal for a servant's act under the doctrine of respondeat superior. Jordan v. Cates, 935 P.2d 289, 292 (Okla.1997)(citing McDonald v. Bruhn, 190 Okla. 682, 126 P.2d 986, 988 (1942); Holmes v. Chadwell, 169 Okla. 191, 36 P.2d 499, 500 (1934)).

. Bourgeois v. Allstate Ins. Co., 02-105 (La.App. 5 Cir. 5/29/02), 820 So.2d 1132, 1135; Jackson v. Ferrand, 94-1254 (La.App. 4 Cir. 12/28/94), 658 So.2d 691, 698, writ denied, 95-0264 (La.3/24/95), 659 So.2d 496.
The same is true in Oklahoma and Texas. Young v. City of Dimmitt, 787 S.W.2d 50, 51 (Tex.1990)(per curiam); Mistletoe Express Service, Inc. v. Culp, 353 P.2d 9, 13-14 (Okla.1960).

. As evidence of Louisiana’s general policy prohibiting punitive damages in toxic tort cases, the Louisiana Legislature repealed in 1996 the statutory authority which allowed the award of exemplary damages for improper storage, handling, or transportation of hazardous or toxic substances. See former La. C.C. art. 2315.3, repealed by 1996 La. Acts No. 2, § 1.

. See Tex. Code Civ. Prac. & Rem. § 41.003 and Okl. Stat. 23, § 9.1.

. Paragraph (2) is not applicable because the parties agree that Louisiana is the state "where the resulting injury occurred.” Because both provisions of Paragraph (2) must be met, the absence of either defeats the authorization of punitive damages.

. Comment (h) to La. Civ.Code art. 3543 provides "[cjases in which the injurious conduct occurs in more than one state should be approached under the principles of causation of the law of the forum. Ordinarily, these principles will make it possible to determine which particular conduct was, legally speaking, the principal cause of the injury.”